170 So.2d 374

**STATE of Louisiana**

v.

**Bruce BARKSDALE.**

**No. 47227.**

Dec. 14, 1964.

Rehearing Denied Jan. 18, 1965.

---

Robert F. Collins, Nils R. Douglas, Lolis E. Elie, New Orleans, for appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Jim Garrison, Dist. Atty., Louise Korns, Asst. Dist. Atty., for appellee.

SUMMERS, Justice.

The appellant Bruce Barksdale, a 27 year old Negro, was charged by the grand jury of Orleans Parish for the October 3, 1962, aggravated rape of a white female. He was tried, found guilty and sentenced to death. On this appeal he relies upon seven bills of exceptions for reversal of the conviction and sentence.

The indictment is drawn in the short form authorized by Article 235 of the Code of Criminal Procedure, LSA–R.S. 15:235. That article permits the crime to be charged in these words: "A.B. committed aggravated rape upon C.D."

The crime of aggravated rape is defined by Article 42 of Louisiana Criminal Code (LSA–R.S. 14:42) as follows:

"Aggravated rape is a rape committed where the sexual intercourse is deemed to be without the lawful consent of the female because it is committed under any one or more of the following circumstances:

"(1) Where the female resists the act to the utmost, but her resistance is overcome by force.

"(2) Where she is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

"(3) Where she is under the age of twelve years. Lack of knowledge of the female's age shall not be a defense.

"Whoever commits the crime of aggravated rape shall be punished by death."

*Bills of Exceptions Nos. 1 and 3*

At the outset appellant requested that the district attorney furnish a bill of particulars. This was answered by the State as follows:

"1) Q. Under which subsection of L.S.A.–R.S. 14:42 is defendant charged?

"A. Subsections 1 and 2.

"2) Q. What is the weapon with which defendant is alleged to have committed aggravated rape?

"A. State is not required to answer.

"3) Q. Where was the alleged aggravated rape perpetrated?

"A. 1023 Chartres Street, upstairs apartment.

"4) Q. What time of day was the alleged rape done?

"A. Approximately 9:30 a. m.

"5) Q. How many times was the alleged victim ravished?

"A. State is not required to answer.

"6) Q. What was the force or threat used in committing the alleged aggravated rape?

"A. State is not required to answer.

"7) Q. Was the victim of the alleged rape merely threatened or was the weapon physically used against the alleged victim?

"A. State is not required to answer.

"8) Q. If the weapon was physically used against the victim was she knocked unconscious?

"A. State is not required to answer.

"9) Q. What injuries aside from the alleged rape did the victim sustain as a result of this aggravated assault?

"A. State is not required to answer."

Except as to the information specifically furnished, the trial judge refused to require the State to further particularize. To this ruling appellant reserved Bill of Exceptions No. 1.

Appellant also filed several motions to quash the indictment. He combines the argument on the bill of particulars with the argument on the motions to quash.

The motions to quash set forth that the indictment violates Article I, Section 10 of the State Constitution, LSA and the sixth amendment of the Federal Constitution, for it is insufficient to properly inform the accused of the nature and the cause of the accusation against him. These motions to quash were denied by the trial judge and Bill of Exceptions No. 3 was timely reserved.

The contention, in essence, is that the short form indictment is invalid especially when it is not supplemented by all of the information requested in the bill of particulars for the accused is not properly informed of the nature and cause of the accusation.

 Although the district attorney may be required to furnish a bill of particulars to a person accused under the short form indictment (Art. 235, Code of Crim. Proc.), he need not be compelled to give the evidence with which the State will prove its case. State v. Scott, 237 La. 71, 110 So.2d 530 (1959), cert. denied 361 U.S. 834, 80 S.Ct. 85, 4 L.Ed.2d 75 (1959); State v. Michel, 225 La. 1040, 74 So.2d 207 (1954); State v. Poe, 214 La. 606, 38 So.2d 359 (1948). And the granting or refusal of a bill of particulars addresses itself to the sound discretion of the trial judge. State v. Labat, 226 La. 201, 75 So.2d 333 (1954), aff'd 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83 (1955), rehearing denied 350 U.S. 955, 76 S.Ct. 340, 100 L.Ed. 831 (1956), cert. denied, 355 U.S. 879, 78 S.Ct. 144, 2 L.Ed.2d 109 (1957).

The indictment sets forth that the crime was committed in the parish of Orleans. It contains the date of the commission of the offense, the name of the accused and the victim as required by Article 235 of the Code and declares that the offense is "contrary to the form of Statute of the State of Louisiana in such cases made and provided and against the peace and dignity of the same."

 The State's reply to the bill of particulars, containing the sections of LSA–R.S. 14:42 under which the State was proceeding and the place and approximate time of the crime, is sufficient. It supplies the accused with adequate information to prepare his defense and has all the information to which appellant was entitled under the law. The other information requested, concerning the weapon used, the number of times the victim was ravished, the force or threats used, whether the victim was merely threatened or whether the weapon was actually used and the injuries received by the victim, was obviously an attempt to obtain knowledge of the evidence relied upon by the State to prove its case, which the law does not require the State to disclose. The refusal of the judge to require the State to further particularize was proper.

 The State and Federal constitutional provisions relied upon in the motions to quash require that in all criminal prosecutions the accused shall be informed of the nature and cause of the accusation against him. This means that an indictment must be drawn in words of sufficient particularity to permit the accused a fair and reasonable opportunity to prepare his defense, Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932); that is, the accusation

should sufficiently inform the accused in order that he may defend himself properly, and it should give enough information to permit the trial judge to intelligently regulate the trial, and should be sufficient to form a record from which it can be clearly determined whether a subsequent proceeding is barred by the former adjudication. State v. Scheler, 243 La. 443, 144 So.2d 389 (1962); 32 Tul.L.Rev. 47, 52 (1957).

■ Realizing the need for a form of criminal pleading that would be simpler, and at the same time guarantee the accused his constitutional right to be informed of the nature and cause of the accusation against him, the Louisiana Legislature in adopting a modern code of criminal procedure in 1928 authorized short form indictments to be used for certain well-defined crimes, such as murder, rape, theft, burglary robbery, etc. Art. 235, Code Crim.Proc.; 6 La.L.Rev. 78 (1944). This short form of indictment authorized by Article 235 has been uniformly upheld by this court as meeting the constitutional test that the accused must be informed of the nature and cause of the accusation. See State v. Eyer, 237 La. 45, 110 So.2d 521 (1959) (murder); State v. Michel, supra (aggravated rape); State v. Scheler, supra (negligent homicide); State v. Wright, 215 La. 529, 41 So.2d 76 (1949) (simple burglary); State v. Howard, 243 La. 971, 149 So.2d 409 (1963) (armed robbery); State v. Durbin, 235 La. 989, 106 So. 2d 443 (1958) (simple robbery); State v.

Roshto, 222 La. 185, 62 So.2d 268 (1952) (theft of animal: heifer). In State v. Clark, 242 La. 914, 140 So.2d 1 (1962), we approved the short form of indictment against a contention that it failed to set forth that the accused "willfully, intentionally and feloniously" committed aggravated rape.

■ The meaning of the words "aggravated rape" are so certain and have such a well-defined meaning that all persons charged in an indictment with that crime could have no doubt concerning the nature and cause of the accusation against him. Moreover, the parish where the crime was committed, the date of the crime and the names of the accused and the victim are given in order that there can be no doubt in the mind of the accused of the facts and circumstances of the crime with which he is charged. Thus, the constitutional requirements and the statutory requirements of Article 227 of the Code of Criminal Procedure LSA–R.S. 15:227 requiring that the indictment state every fact and circumstance necessary to constitute the offense are satisfied.

There is no merit in Bills of Exceptions Nos. 1 and 3.

*Bills of Exceptions Nos. 4 and 10*

Bill of Exceptions No. 4 was taken to the denial of the Motion to Set Aside the Jury Commission, General Jury Venire, Grand

Jury Venire, Grand Jury and Petit Jury Venire. This motion alleged violations of rights guaranteed by the sixth and 14th amendments to the Federal Constitution by the discriminatory administration of the jury system and the exclusion of all but a token number of Negroes.

Bill of Exceptions No. 10 was taken to the denial of a Motion to Set Aside the Petit Jury. This motion is substantially the same as the one involved in Bill of Exceptions No. 4.

The theory of appellant's case as far as these two bills are concerned is that there is a lack of an impartial administration of the jury system in Orleans Parish. This is accomplished, it is contended, by exclusion of Negroes and the simultaneous inclusion of a token number of Negroes on the venires and on the grand and petit juries.

It is conceded that the issues presented by these bills are questions of fact.

The State entered into four stipulations with the defense. Using the facts revealed by these stipulations and the testimony of the judges, former district attorneys, jury commissioners and defense counsel practicing before the criminal courts of Orleans Parish the appellant asserts he has made out a prima facie case.

In our review of the evidence on this issue we cannot consider, as the defense seeks to do, the attempt to show a system or pattern of discrimination against Negroes in the selection of juries in Orleans Parish prior to 1958. In this year the United States Supreme Court decided the case of Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991, in which the conviction of the Negro Eubanks for murder was set aside because there had been discrimination against Negroes in the selection of the Orleans Parish grand jury which indicted him.

Since that time the jury commission and the judges of the parish have adopted a practice of jury selection in keeping with the spirit of the law announced in the Eubanks case. The record reflects a change in their former practice and the inclusion of Negroes where none were included before the Eubanks case. To continue to consider the practices of the past which were found in the Eubanks case to be discriminatory would permit any party accused since that time to forever rely upon those discarded practices to upset his conviction —a result we will not countenance. We are supported in this regard by the decision in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

Appellant's motion to set aside the jury commission, the jury venires and the grand and petit juries asserts that segregation is the policy of this State; that within the criminal court building the rest rooms are segregated; that no Negroes serve on the district attorney's staff; that no Negroes

serve in any official capacity in the criminal courtrooms; that prisoners in the Parish Prison and House of Detention are segregated; that Negroes must sit in special sections of the courtrooms; that within the courtroom in which the accused was tried there is a door on which the words "Witnesses" and "Colored" are written and that many Louisiana laws require segregation.

 The State's policy on jury selection is expressed by the Legislature in its declaration that "there shall be no distinction made on account of race, color or previous condition of servitude" in the determination of the qualifications to serve as a grand juror or a petit juror. (LSA–R.S. 15:172, State v. Goree, 242 La. 886, 895, 139 So.2d 531 (1962). Other laws of Louisiana requiring segregation of the races, unrelated to the selection of juries or criminal prosecutions, even if they were constitutional, have no bearing upon the appellant's constitutional rights to due process and a trial by a jury of his peers or the guarantees of the 14th amendment in this trial. What appellant must show is discrimination in the selection of the grand jury which indicted him and the petit jury which tried him. Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Brown v. Allen, supra.

A stipulation in the record makes it plain that the room in Judge Cocke's courtroom, on the door of which are painted the words "Witnesses" and "Colored", has for the past nine years, or since 1954, been used to store the air conditioning unit which cools the courtroom, and hence this door is a meaningless relic of former years.

 From 1954 to 1958 there were several Negroes on the investigative staff of the district attorney's office and from 1958 to 1962 there were two Negro assistant district attorneys. No system or policy of discrimination is established merely because there are none employed at the present time.

Insofar as the courtroom in which this accused was tried, the trial judge on his official oath states in the per curiam to this bill that there was no segregation of the races in his courtroom, and nothing in the record indicates the contrary except the unfounded allegation of the mover.

 Isolated instances of discrimination within a state could not nullify every trial held there. The fact that a particular group is sometimes treated as a separate class within a community is not proof of discrimination in the selection of juries. It only serves as background material. Hernandez v. State of Texas, supra. The instances of discrimination relating to segregation in the House of Detention and the Parish Prison and rest room facilities in the courthouse, which are conceded to exist, do not constitute a show-

ing of discrimination in the selection of the juries in this case. Indeed, no causal relation has been shown between those practices and the jury selection under attack.

█ Another complaint is that no Negro has ever served as Jury Commissioner or as Foreman of the Grand Jury in Orleans Parish. These are appointive offices filled by the governor and judges, respectively, based upon their evaluation of the qualification of the individual appointee. The absence of Negroes in those offices at this time is not evidence of systematic discrimination against Negroes in the selection of juries.

It is charged that no Negro has ever served on a petit jury in Orleans Parish in a capital case; this is due, it is contended, to the alleged discriminatory administration of the jury system in this parish. The effect of this discriminatory practice, it is asserted, is that so few Negroes are examined on voir dire that the State can eliminate those by use of its peremptory challenges.

Again, we find this charge unfounded. The record shows that Negroes have served on petit juries which tried cases, capital and otherwise, and have invariably been on the panel in capital cases. For example, the trial judge's per curiam to Bills 5 and 6 sets forth that of the 81 persons available for jury service in July of 1962, from which the trial jury in the instant case was chosen, 67, or 82.7 percent, were white and 14, or 17.3 percent, were Negro. The State could not peremptorily challenge all 14 of the Negroes.

█ However, there is an explanation for the fact that a small percentage of Negroes usually serve on petit juries in Orleans Parish. Educational and economic factors combine to explain why only 19.43 percent of the persons in the jury wheel on January 1, 1962, belonged to the Negro race, why only 16.50 percent of those on the jury list on this date were Negroes, and why only 15.95 percent of those who actually served on petit juries in criminal cases in 1962 were Negroes, although in that year Negro males between 20 and 64 years of age formed approximately 33 percent of the total male population in that age group in the parish. Of the Negroes who are chosen as competent for jury duty by the jury commission and whose names are put on the jury list and in the jury wheel, some ask the judge to excuse them from this service when they are actually called, just as white jurors do, and in capital cases a much larger number of Negroes than white men object to capital punishment on the voir dire, and so disqualify themselves for that reason. The few Negroes left, after these self-disqualifications, are generally peremptorily challenged by both the State and the defense in capital cases, even when the accused is a Negro. Removal by per-

emptory challenge of persons of the accused's sex, race, class, etc., from the petit jury which tries his case violates none of the accused's constitutional rights. This rule of law applies with special force when the defense itself exercises the peremptory challenges. State v. Ward, 246 La. 766, 167 So.2d 359 (1964); United States ex rel. Dukes v. Sain, 297 F.2d 799 (7th Cir. 1962), cert. denied 369 U.S. 868, 82 S.Ct. 1035, 8 L.Ed.2d 86 (1962).

■ The contention that the 14th amendment requires proportional representation of all the component ethnic groups of the community on every jury has been rejected. See Hernandez v. State of Texas, supra; Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945). Appellant can only claim the right "to be * * * tried by juries from which *all* members of his class are not systematically excluded—juries selected from among all *qualified* persons regardless of national origin or descent." (Emphasis added.) Hernandez v. State of Texas, supra.

In a further attempt to establish systematic discrimination against Negroes, appellant argues that the decided variation between the population ratio of whites to Negroes and the ratio of whites to Negroes on the general jury venire, a variation which it is contended has long existed and

cannot be explained, furnishes sufficient evidence of a lack of an impartial administration of the jury system and systematic exclusion of all but a token number of Negroes on the general jury venire and the grand jury venire.

But the record does not support such an assertion. Of approximately 158,000 males in Orleans Parish between the ages of 20 and 64, 51,724—or a little more than 33 percent—are non-white. Approximately 26,-714 Negro males in this age group have had seven or more years of formal schooling. In 1962, of the 607 persons whose names were in the jury wheel as of January 1, 1962, 19.43 percent were Negroes. Of the 1,200 persons called for petit jury service as of January 1, 1962, 16.5 percent were Negroes, and of the 3,210 persons who actually served on petit juries in criminal cases between January 1, 1962, and December 31, 1962, 15.95 percent were Negroes.

The difference in the percentage of the total Negro population (33 percent) and the percentage of Negroes in the jury wheel (19.43 percent) is explained by the State to be due to factors unrelated to a planned, systematic discrimination.

Article 194 of the Code of Criminal Procedure, LSA–R.S. 15:194 ordains that the jury commissioners shall select at large, impartially, from the citizens of the parish having the qualifications requisite of registered voters, 750 competent persons. These

names form the list from which the jury wheel is composed and from which the drawing is to be made—the list to be supplemented from time to time as the necessities of jury service may require. No drawing shall be made from a list of less than 750 names.

Article 195 provides for the drawing upon order of court as required of 50 names for each petit jury.

Article 172 requires that a person must, among other things, be able to read and write English to serve as a grand or petit juror in Louisiana. The qualifications of a registered voter demanded by Article 194 include a certain level of understanding of how our government functions. (See LSA–R.S. 18:31.) Article 192 authorizes the jury commissioners to qualify all persons before their selection as jurors, that is to say, it is the jury commission's duty to include in the general jury venire only those men who appear to have the requisite education and understanding of the functions of government, which in this instance involves trial procedure.

An analysis of the census for New Orleans relating to schooling for males reveals that approximately 52 percent of the Negro males between 25 and 65 have finished no more than seven years of school and only 5.6 percent of the Negro males in this age group have had one or more years of college, whereas only about 23

percent of the white males in this category stopped school after the seventh grade or earlier, and more than 25 percent of the white males have had one or more years of college. Between the eighth grade and the last year of high school the percentages are more equal; 42 percent of the Negroes finished anywhere from eight to 12 years of school and 51 percent of the white males fall into this category.

These figures on the educational attainments of the two races account for the "variation between the population ratio of whites to Negroes and the ratio of whites to Negroes on the General Jury Venire" complained of by the appellant. The facts are clear. More Negroes lack educational qualifications to be jurors than whites and this lack of education among the Negroes inevitably compels them to accept less gainful employment, often such as to create an undue hardship if they are compelled to accept jury service, which is without pay in Orleans Parish.

The Chairman of the Jury Commission testified that the commissioners get the names of prospective jurors from the city and telephone directories. This source, of course, gives no indication of the listed person's race.

Thus it is apparent that over half of the Negro males in Orleans Parish of jury service age have such a limited education that their eligibility for jury duty is

often unsuitable, whereas, less than one-quarter of the white males are in this same category. There is, therefore, a rational and logical explanation for the variance in the number of Negro persons whose names appear on the general venire.

The complaint relating to the grand jury is also without substance. Since the Eubanks case, supra, in 1958, Negroes have served on grand juries in Orleans Parish.[1]

Because the grand jury venire of 75 is drawn from the jury wheel, the grand jury venire is a small part (about one-tenth) of the general venire. The reason Negroes on the grand jury venire form no more than 10 to 18 percent of that venire is the same reason that causes the variation in the general jury venire from the Negro population, that is, the percentage of Negro males qualified for jury service is severely limited by factors of education and economics unrelated to a system of planned discrimination. Therefore, in the selection of the grand jury itself, the same explanation is suggested by the record. Grand jurors are traditionally chosen by the judge in Orleans Parish among the more qualified members of the community on the basis of their sober judgment and wider experience.

The educational data revealed by the census shows that of the 51,724 Negro males between the ages of 20 and 64 in Orleans Parish in 1960, roughly 5.6 percent had any college training, as compared with 25.4 percent of the white men in this age group. Too, the judges testified that because of the time a grand juror must devote to service during the six months he is in office (one or two days a week), a great number of men ask to be excused because they are unable to bear the economic consequences of the loss in earnings incident to this service. The testimony shows that the percentage of Negroes who ask to be excused is greater than the whites. Some of the judges testified that they acceded to

1.

| | Grand Jury Venire Total | Grand Jury Venire Negro & Colored | Percent of Total | Grand Jury Venire Negro Col. & Undeter'd | Percent of Total | Negroes Who Actually Served on Grand Jury |
|---|---|---|---|---|---|---|
| Mar. 58 | 100 | 7 | 8 % | 14 | 14 % | 1 |
| Sept. 58 | 100 | 7 | 7 % | 10 | 10 % | 2 |
| Mar. 59 | 100 | 10 | 10 % | 15 | 15 % | 2 |
| Sept. 59 | 100 | 6 | 6 % | 11 | 11 % | 2 |
| Mar. 60 | 75 | 6 | 8 % | 10 | 13.3% | 2 |
| Sept. 60 | 75 | 9 | 12 % | 12 | 16 % | 1 |
| Mar. 61 | 75 | 8 | 10.6% | 10 | 13.3% | 2 |
| Sept. 61 | 75 | 11 | 14.6% | 11 | 14.6% | 2 |
| Mar. 62 | 75 | 10 | 13.3% | 14 | 18.6% | 2 |
| Sept. 62 | 100 | 14 | 14 % | 14 | 14 % | 2 |

these requests to alleviate the hardships involved to those persons.

▇▇▇ The testimony of the judges, fairly summarized, discloses that since the Eubanks case they have made an effort to include Negroes on the grand jury—to which appellant objects. But this is not the type of intentional inclusion struck down by the decision in Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), and this practice in no way denies rights under the 14th amendment.

As this court said recently in State v. Mack, 243 La. 369, 144 So.2d 363 (1962), cert. denied, 373 U.S. 917, 83 S.Ct. 1306, 10 L.Ed.2d 416 (1963):

"We do not understand the law to be that an indictment, which is an accusation only, must be set aside because members of a defendant's race have been intentionally included in the grand jury list. Such a rule would make it virtually impossible to legally impanel a grand jury under a system of selection which requires an investigation of competency and a weighing of qualifications. Under such a system, knowledge of a prospective juror's race on the part of the Jury Commission is inevitable."

▇▇▇ It is well-settled that it is a violation of the 14th amendment to systematically discriminate against a particular

race in the selection of juries which are to indict or try a person of that race. Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964); State v. Goree, 242 La. 886, 139 So.2d 531 (1962). This does not mean that variations in proportions of Negroes and whites on jury lists from racial proportions in the community constitute systematic discrimination which the constitution prohibits.

"The mere fact of inequality in the number selected does not in itself show discrimination. A purpose to discriminate must be present which may be proven by systematic exclusion of *eligible* jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination." (Emphasis added.) Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945).

▇▇▇ The question of what constitutes a sufficient showing of intentional discrimination in jury selection is one of fact, varying in its solution with individual cases. And the burden of establishing racial discrimination rests upon the accused. Hernandez v. State of Texas, supra, and State v. Goree, supra.

▇▇▇ Appellant has failed to prove systematic discrimination against members of the Negro race by purposeful limitation in the selection of juries because of race,

and the variation complained of between the Negro population and the number of Negroes who serve on juries has been adequately explained by the facts.

## Bill of Exceptions No. 6

Prior to the trial on the hearing of the motion contesting the jury selection, the Chairman of the Jury Commission was asked how he was able to furnish the statistical information concerning the number of Negroes on the jury wheel. He explained that his office had 50 to 60 thousand cards on file which contained the information. These cards are subpoenas or notices demanding personal appearance before the Jury Commission to testify concerning the prospective jury venireman's qualifications. The card used contains instructions to fill out the back of the notice and to bring it at the time when the subpoenaed party reports. The blanks on the back of the card provide for the party's name, address, phone number, name of employer, employer's address and phone number, occupation, age, sex, race, and information concerning how long the party has been a resident of the parish, whether he has been convicted of a felony, whether he is under indictment, interdiction, etc., whether his hearing or eyesight is impaired or whether he has other physical incapacity, when he served last on a jury panel in the parish and what season of the year it would be most convenient to serve.

▮▮ The chairman was asked how long he had had the blank for racial designation on the cards and he testified that it had been included since 1954. He was then asked why that blank had been inserted on the card and he replied that it had been included because "It was contended by certain people that we were not including Negroes on the jury wheel and so we decided to put race there for our own information." He further testified that no one advised them to include that blank on the questionnaire. The defense then sought by repetitious questioning to ascertain from this witness the reason why the blank relating to race had been included and whether the commission had been advised by an attorney to insert the blank concerning race. Objections by the State's attorney to these questions were sustained by the judge because the questions had already been answered. To this ruling the defense reserved Bill of Exceptions No. 6.

The trial judge's ruling was proper and there is no merit to this bill.

Moreover, it was only because of this racial designation on the cards that any information concerning race was available to compile the statistics which the defense demanded concerning race. And it was shown that the race designation played no part in the selection of the names that were placed on the jury list.

## Bill of Exceptions No. 8

During the trial of the motion to set aside the jury commission, the jury venires and the grand and petit juries, counsel for the accused called Judge Oliver P. Schulingkamp, judge of another section of the Orleans Parish Criminal District Court, and questioned him about the qualifications he sought in a prospective grand juror. Judge Schulingkamp answered in substance that he tried to find serious men of sound judgment who were financially able to serve. The judge was then asked whether, using these criteria, he had found Negroes to be less qualified than others. He replied that he had. He was further asked whether he felt that "in this city, out of the total number of persons over 21 years and male that Negroes are less qualified to serve as jurors than their counterparts?"

At this. point the State objected unless the witness was questioned about specific juries or specific grand juries, matters he knew from his own experience as a judge, whereupon the court instructed defense counsel to confine himself to Judge Schulingkamp's views on the selection of grand juries, which was the question then at issue, and forbade defense counsel to ask questions concerning the qualifications of Negroes in general. Defense counsel thereupon objected to the court's ruling and reserved Bill of Exceptions No. 8.

The trial judge ruled correctly in requiring defense counsel to restrict his questions to specific circumstances connected with Judge Schulingkamp's selection of grand juries. The general opinion the judge may have entertained as to the qualifications of Negroes generally in the community was irrelevant to the trial of the issues before the court. The specific issue before the court at that time was whether Negroes were systematically discriminated against in the selection of the grand juries in Orleans Parish.

This bill is without substance.

## Bill of Exceptions No. 9

While the motion to quash the juries was being tried, Judge Edward A. Haggerty, judge of another section of the Orleans Parish Criminal District Court, was called to testify by the defense. Questioned as to the qualities he sought in grand jurors, he replied that he looked for a man of experience, of some stature, a man who could fit in with the eleven other members of the jury. When asked if he found the Negroes on the grand jury venire less qualified than the white men, Judge Haggerty explained that he had found them less qualified because of their relatively inferior educational background. When he was asked if it was because of this lack of qualification that he had selected only two Negro grand ju-

rors in 1960, the State objected to the question, the trial judge sustained the objection, and Bill of Exceptions No. 9 was reserved.

 It is noted, however, that later in his examination by defense counsel on this same issue of racial discrimination Judge Haggerty was asked to explain why he personally had not selected more Negroes on the grand jury he assembled. He responded that he interviewed all 75 of the men on the venire and that among this number were 12 to 15 Negroes, 90 percent of whom said they couldn't stand the grand jury service because they wouldn't be paid and had to earn a living. From three to five of the Negroes, as Judge Haggerty recalled, indicated an ability to serve, but of this number a few did not qualify because of personal characteristics. Of the two he finally selected, one backed out at the last minute.

In view of the fact that Judge Haggerty later answered defense counsel's question about why he had not selected more than two Negro grand jurors in 1960, the objection and ruling of the court which form the basis of this bill have become moot. The testimony which the defense sought is in the record. For this reason we need not decide the technical validity of the objection and the trial court's ruling.

The conviction and sentence are affirmed.

170 So.2d 386