SUMMERS, Justice.
 

 Cleveland Johnson and Morris Johnson were tried together on charges that they murdered Goalda Brookman. They were convicted and sentenced to death. On this, appeal we find that a fair trial was had and that no error occurred which prejudiced the defendants or which would warrant setting aside their convictions and sentences.
 

 At noon on January 17, 1964, the Legier Realty Company at 3808 North Prieur Street in New Orleans was robbed. A worn- • an receptionist, Goalda Brookman, was fatally shot by one of the three robbers, all Negroes. The robber-killers then fled the scene in a 1949, black, Chevrolet automobile. Police were called, and Detective Vigurie and others arrived in fifteen minutes. A description of the get-away car - and "the license number were obtained • from a woman in the neighborhood and broadcast by police radio. Then, around 2 o’clock, police cruising in the vicinity of Reynes Street and Florida Avenue located the- automobile abandoned by the-robber-killers. .
 

 
 *959
 
 In the meantime, because they were shorthanded, the New Orleans police had requested assistance from the Sheriff’s Office of adjoining St. Bernard Parish. Responding to this call for assistance, Deputy Sheriffs Hernandez and Sanchez drove to the North Prieur Street address.
 

 When the location of the get-away car was reported to Detective Vigurie at the scene of the crime, he was told by Deputy Sheriff Hernandez to come with him to the house of Cleveland Johnson on Monticello Street about ten blocks from the abandoned get-away car, where they would find the killers. Acting on this information Detectives Vigurie, Hernandez, Sanchez and Perrot rushed to the Monticello Street address.
 

 Hernandez later testified at the trial that he directed the pursuit to the Monticello house because Cleveland Johnson had called him early on the morning of the crime, identified himself, and told Hernandez a job would be pulled that morning. Although Cleveland Johnson did not say where it would take place, he told Hernandez that after the job he and the other participants would be at his house on Monticello Street, where Hernandez had been before on numerous occasions in the past in connection with other criminal investigations. Testimony at the trial also disclosed that Cleveland Johnson had previously given Plernandez exact and reliable information about other crimes. He was one of Hernandez’s reliable informers.
 

 Incredible as it seems, as events developed, Cleveland Johnson informed on himself. What he had in mind when he telephoned Hernandez that morning is veiled in mystery. Perhaps it was not his plan at that time to take part in this job, and the other participants later compelled him to join them — an inference to this effect may be gained from the evidence. Or perhaps he felt his role as driver of the getaway car would not involve him so deeply and the police would exonerate him because he informed. Or perhaps he felt there would be no killing. Whatever his true motive may have been, the inferences and implications we may draw from the record furnish no plausible explanation for his conduct.
 

 Nevertheless, the trial judge found that the officers had positive knowledge that the robbery-killing had taken place and had probable cause and reason to believe that Cleveland Johnson was an actor in the crime. In doing so we infer that he attributed validity to Officer Hernandez’s testimony concerning Cleveland Johnson. He undoubtedly accepted the other facts as we narrate them, and we are of the opinion that the record supports the finding.
 

 It was about 3 o’clock when the four officers approached the residence of Cleveland Johnson at 2520 Monticello
 
 *961
 
 Street in New Orleans. Vigurie, who was in charge, realized upon arrival that he was familiar with this house in connection with other criminal investigations. This knowledge induced him to go to the rear and to instruct the other officers to knock on the front door. The knocking and the anouncement by the police that they were there resulted in a scurrying and running about of people within the house. Vigurie heard this commotion, and suddenly Morris Johnson burst excitedly out the back door and ran into the yard, whereupon he was halted and arrested by Vigurie. Through the open door from which Morris Johnson had just emerged, Vigurie saw several persons running from room to room as in a frantic effort to find an avenue of escape.
 

 The officers then entered the house. There they found Irving Breaux sitting on a bed, and in plain view beside him were eight 38-caliber cartridges. Money was hanging out of a partly closed drawer nearby. Cleveland Johnson was found hiding in a closet. Both were arrested and taken into custody along with Morris Johnson. (Breaux, the third man involved in the crime, later pled guilty without capital punishment and was sentenced to life imprisonment.) Searching the house further the officers found the barrel of a sawed-off shotgun.
 

 At the trial, the money and gun barrel were related to the robbery by the testimony of Vigurie. The money and gun barrel were introduced in evidence by the prosecution, and Vigurie’s testimony concerning what happened at the time of the arrests and what the accused persons said was also admitted. Objection by the defense was timely made and overruled.
 

 The Arrests, Search and Seizure
 

 The first bill of exceptions involves the contention that prejudicial error occurred during the trial, because of violations of rights guaranteed defendants by both the State and Federal Constitutions relating to arrest and search and seizure. Defendants bottom this assignment of error on what they consider to be the erroneous rulings of the trial court when it admitted the money and gun barrel in evidence and permitted Vigurie to testify concerning what he saw and heard at the time of the arrests.
 

 Under this contention of the defense, it is asserted that the arrests of these defendants were illegal and the search and seizure resulting from those arrests were unlawful. Thus, it is argued, the money, gun barrel and Vigurie’s testimony were the tainted fruit of the illegal arrests, search and seizure. Inadmissibility of the evidence, is claimed because the arrest, search and seizure were made without warrants, and the arresting officers had no reasonable belief or probable cause to conclude that defendants had murdered Goalda Brookman.
 

 
 *963
 
 Although conceding
 
 there
 
 was no warrant for'the arrest of these defendants and that the officers had no warrant to search the Monticello Street house, the State takes the position that warrants were unnecessary. The prosecutor says the officers were to some extent in hot pursuit of the robber-murderers and, more importantly, that there was evidence which gave them reasonable belief or probable cause to conclude that Cleveland and Morris 'Johnson were the parties they sought. Hence, the prosecutor argues, the arrests of the defendants were legal and the ensuing search of the dwelling and seizure of objects therein were also lawful as incident to those arrests. Objects seized in the house were, therefore, admissible in evidence at the trial. Likewise, oral testimony concerning facts and statements surrounding the arrest was also properly admitted.
 

 Thus, the issues presented by this first assignment of error are: (1) whether the arrests of Cleveland and Morris Johnson by Detective Viguri.e and the other officers were made
 
 pn
 
 reasonable belief or probable cause that .the Johnsons had murdered Goalda Broolcman -and, if so, (2) were the search of the Monticello Street house, the seizure of the money' and gun barrel and the facts learned at that time, to «which Wigurie' testified, incident to those arrests?
 

 Reasonable Belief or Probable. Cause to Arrest
 

 In resolving the first questions, we are guided by settled standards recognized by adjudications of our highest courts relating to search and seizure under both State and Federal Constitutions:
 

 Louisiana’s standard is set by the legislature. Article 60 of our Code of Criminal Procedure permits an arrest by a peace officer without a warrant, “When a felony in fact has been committed and he has reasonable cause to believe that such person-has committed it. * * * ”
 

 Reasonable belief — or “probable cause”, as it is termed under the federal standard — to make an arrest without a warrant exists when the facts and circumstances within the arresting officer’s knowledge, and of which he has reasonably trustworthy information, are sufficient in themselves to justify a man of average caution in the belief that a felony has been or is being
 
 committed.
 
 Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); State v. Green, 244 La. 80, 150 So.2d 571 (1963); State v. Aias, 243 La. 945, 149 So.2d 400 (1963) ; State v. Calascione, 243 La. 993, 149 So.2d 417 (1963).
 

 Compliance with these standards is, in the first instance, a substantive determination to' be made by the trial court
 
 *965
 
 from the facts and circumstances of the case. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) ; State v. McIlvaine, 247 La. 747, 174 So.2d 515 (1965).
 

 And in determining compliance with these standards it is not the proof required for conviction which concerns us. Proof required to satisfy the requirement of reasonable belief or probable cause is less and is what the terms imply: probabilities and practical considerations of everyday life on which reasonable men could reasonably be expected to act. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); State v. Bourg, 248 La. 844, 182 So. 2d 510 (1966).
 

 In such cases, because only factual issues are presented by the contentions, the setting in which the arrests took place becomes a factor of prime importance; facts and circumstances known to the arresting officers from which they might draw conclusions warranted by their training and experience become the focus of our attention with due allowance for the discretion vested in the trial court.
 

 When we view the facts as they pertain to the contentions presented by the bill of exceptions under consideration, we observe that: aside from the officers’ positive knowledge that the robbery and killing had taken place, Hernandez had received information from Cleveland Johnson, whom 'he knew to be a reliable informant, that the participants would be at the Monticello Street hou'se; Hernandez told Vigurie what he knew; the house was only a few blocks from the abandoned escape car; it was known to both Vigurie and Hernandez as the dwelling of a person often investigated for crime; when the officers announced their- presence at the house the occupants were heard to run and scurry about, one of them attempting to escape out of the back door; and, upon entering, the 38-caliber cartridges and money were in plain view and no search was required to discover them.
 

 In addition to the authorities to which we have referred on this question, it is relevant to mention that flight has long been recognized as a legitimate ground for the inference of guilt, Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); State v. Melton, 37 La.Ann. 77, 79 (1885); Marr’s, Criminal Jurisprudence, Sec. 564 (1923 ed.). And it is not a search to see what is patent and obvious. Fagundes v. United States, 340 F.2d 673 (1st Cir.1965).
 

 Applying the law here, we find the facts did establish probable cause and did warrant these officers in having a reasonable belief that the persons in the Monticello Street house were the parties who participated in the robbery and killing of Goalda Brookman. The arrests made under these circumstances were legal under both state
 
 *967
 
 arid federal constitutional standards. And the search and seizure made almost simultaneously were incident thereto. The money and shot-gun barrel and Vigurie’s testimony concerning what he heard and saw in connection with the arrests were therefore admissible in evidence.
 

 Admissibility of Cartridges and Revolver
 

 Acting on information furnished by Cleveland Johnson at the time of his arrest, the officers went to 2608 Benton Street, the residence of Irving Breaux. Written permission to search this house was then obtained from the occupants. There the officers found the 38-caliber revolver, which was later identified as the murder weapon. At the trial, this revolver and the eight 38-caliber cartridges found in the house of Cleveland Johnson were introduced in evidence over defense objections.
 

 These objections are founded on the notion that the information obtained concerning the location of the revolver in the Benton Street house and the cartridges found in Cleveland Johnson’s house were obtained as a rsult of searches and seizures conducted incident to illegal arrests. Consequently, the evidence should not have been admitted. In deciding that the arrests were made upon reasonable belief or probable cause that a felony had been committed, we decided these contentions. They are based upon the sáme factual situation and the same argument. They are, therefore, without merit.
 

 Admissibility of Reenactments, Admissions and Confessions
 

 We come next to a consideration of contentions by both defendants that certain oral and written statements and evidence of the reenactments of certain aspects of the crime were inculpatory admissions and confessions which were improperly admitted in evidence. It is argued that they were improperly admitted because (1) they were not freely and voluntarily made, (2) they were made outside the presence of counsel, (3) the accused were not advised of their right to counsel, (4) nor told that they could remain silent (S) or taken before a magistrate.
 

 The Free and Voluntary Character of the Confessions
 

 The free and voluntary character of the inculpatory admissions, reenactments and confessions, all of which are governed by the same rules (State v. Domino, 234 La. 950, 102 So.2d 227 (1958)), present questions for the trial judge; and his ruling will not be disturbed on appeal unless clearly erroneous. State v. Bueche, 243 La. 160, 167, 142 So.2d 381
 
 (1962).
 

 All of the officers, who dealt with these accused from the time of their arrest until the last confession was dictated, testified the accused were not threatened or coerced in any way, nor were they offered induce
 
 *969
 
 ments or promised rewards. Assistant Coroner Medina examined them and found no evidence of physical mistreatment. Only the uncorroborated testimony of the accused parties, which the trial judge found to be unworthy of belief, stands to support their position. Moreover, their versions were contradictory.
 

 Some of the inculpatory admissions were made by Cleveland Johnson, Morris Johnson and Irving Breaux to one Jerome Stripling who had no connection with the crime or law enforcement. These statements were made before the arrests, at the Monticello Street house and outside the presence of the officers. They were in no manner elicited by force, threats or promises. Later admissions, reenactments and confessions merely expanded on the particulars of the participation by defendants in the robbery-killing initially established by these spontaneous, guarded admissions in the presence of Jerome Stripling. We find, therefore, that the reenactments, admissions and confessions were not induced by force and that they were free and voluntary.
 

 The Right to Advice Concerning Counsel and to Remain Silent
 

 The contention that the admissions, reenactments and confessions were inadmissible in evidence because they were made outside the presence of counsel and because the accused were not advised of their right to counsel or told that they could remain silent is also without merit.
 

 Prior to the decision in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, decided June 13, 1966, Louisiana had no law excluding, and the due process clause of the Fourteenth Amendment to the Federal Constitution had not been extended to exclude, confessions made where the accused had not been advised of his right to counsel or told that he could remain silent. The case at bar was tried when the law was in that condition. Since the decision in the Miranda case these standards have been altered to require advice to a suspect of his right to counsel before an in-custody interrogation can take place, otherwise a violation of constitutional rights occurs. U.S.Const, amend. VI.
 

 But in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, decided June 20, 1966, the Federal Supreme Court held that the requirement that the accused be advised of his right to counsel would not be retrospective in effect and would not apply to trials begun before June 13, 1966, the date of the Miranda decision. The Johnson case also held that the advice relating to the right to counsel required by the decision in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 877 (1964), upon which defendants rely, would not be imposed in trials begun prior to June 22, 1964, the date of the Es-
 
 *971
 
 i . , cobedo decision. Trial in the instant case was begun on September 21, 1964. Miranda, therefore, is not pertinent, whereas the Escobedo decision would be controlling if the facts of the case before us were similar to those in Escobedo.
 

 The precise holding of Escobedo was that statements elicited by the police during an interrogation may not be used against the accused at a criminal trial:
 

 “ * * * [Where] the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements,
 
 the suspect has requested and been denied an opportunity to consult with his lawyer,
 
 and the police have not effectively warned him of his absolute constitutional right to remain silent * * (Emphasis added.)
 

 See also Johnson v. State of New Jersey, supra, and State v. Bourg, 248 La. 844, 182 So.2d 510 (1966).
 

 As the State’s brief points out, the factual situation which formed the basis for the decision in-Escobedo does not exist here — that is, the accused in this prosecution did not ask to consult with a lawyer before talking to the police, nor did they have a lawyer who sought to speak to them.
 

 The Requirement That the Accused be Taken Before a Magistrate
 

 At no time were defendants taken before a committing magistrate, and the written confessions were given long after the arrests and bookings. By reason thereof, defendants assert, there was ample time to bring them before a magistrate in the interval. Aside from the fact that the law of this State (La.Code Crim.Proc. art. 80 (1928)) directs that this should be done, they say if this had been done the officers would never have obtained the confessions. This failure to bring them before a magistrate, they argue, results in a denial of due process guaranteed by Article I, Section 2 of the Louisiana Constitution rendering the confessions invalid. As a result prejudicial error occurred when the confessions were admitted into evidence. Two recent decisions of this court have resolved this question. State v. Simpson, 247 La. 883, 175 So.2d 255 (1965); State v. Marchetti, 247 La. 649, 173 So.2d 531 (1965). La.Code Crim.Proc. art. 80 (1928).
 

 When the law directs that persons arrested without a warrant be brought before a committing magistrate without delay, its design is to grant the party in custody an opportunity to demonstrate that his detention is illegal, if such is the case, and to require a formal charge to be lodged without delay; otherwise the arrested party is entitled to be released. La.Code Crim.
 
 *973
 
 Proc. art. 81 (1-928). ■ Illegal'detention is the evil this legislation seeks to correct. Here defendants were arrested at .3 o’clock in the afternoon, and the last confession was given at about 5 o’clock the next afternoon, a total of twenty-six hours. This, time interval does not violate the requirement that the arrested party be brought, before a magistrate “without unnecessary delay.” Detention of. these defendants was therefore not illegal when the confessions were given, and-failure to bring them before a magistrate had no bearing upon the legality of the confessions.
 

 It is also contended that these reenactments, admissions and confessions were the fruit of unlawful arrests; but this contention was put at rest at the outset when we decided the arrests were legal.
 

 The Motion for Appointment of a Lunacy
 
 Commission,
 
 Etc.
 

 On the morning scheduled for the trial after the jurors assembled, counsel for Morris Johnson filed a motion to withdraw his plea of not guilty, and in lieu thereof entered a plea of not guilty by reason of insanity. He further moved for the appointment of-a lunacy commission and to continue the trial. By the motion it was represented that because of his indigence he had been furnished court appointed counsel, who, in spite of their diligence, could- not represent him properly in this insanity plea-without the assistance' and advice of medical doctors. Accordingly, they -asked that- the court make available- the sum of money necessary to hire experts, or, in lieu thereof, appoint a commission to inquire into the sanity of defendant and make a report of the examination and any tests therein available to mover and to the-court.
 

 At the trial of this motion, the judge carefully examined and observed Morris Johnson. Evidence offered to support the claim of insanity consisted of .the testimony of Morris’ father, mother and a neighbor. In his per curiam, the trial judge observed that he found nothing in the evidence offered which would give cause to believe that defendant was insane. Witnesses for Morris Johnson simply testified that he sometimes slept under houses, he was disobedient to his mother, provoked arguments and fights from which he ran, once attempted to molest an old woman, and on one occasion he repaired an' old 'shotgun and shot it on the street in front of a grocery store. Much of this testimony was vague and hearsay in character. The witnesses were surely biased.
 

 Interrogation of Morris Johnson by the judge disclosed that Johnson had an eighth grade education, he was well oriented, knew his attorneys, was aware of the charges against him and remembered the ages of his brother and sisters, how long he had been in prison, the name and location 'of the school he attended and the date of his birth. The trial judge observed that he was well
 
 *975
 
 oriented as to time and place, lie was able to communicate with his counsel, and his physical appearance and actions “reflected not one scintilla of abnormality.”
 

 The law presumes that a man is sane. State v. Graves, 247 La. 683, 174 So.2d 118 (1965). No absolute right to the appointment of a lunacy commission is assured by the law in every case. It is a matter which addresses itself to the sound discretion of the trial court, whose judgment wc will not reverse unless there is a showing of clear abuse of that discretion. La.Code Crim.Proc. arts. 267, 268 (1928). State v. Johnson, 226 La. 30, 74 So.2d 402 (1954). The test in such a case is whether, from the facts, there is reasonable grounds to believe that the accused is mentally defective. State v. Johnson, supra.
 

 Under these rules the accused bears the burden of establishing by a clear preponderance of the evidence reasonable grounds for the judge to believe that he was mentally defective. State v. Graves, supra.
 

 A review of the record fails to support the claim of the accused or his contention that the trial judge erred. As the record abundantly supports the ruling, the motion to appoint a commission and to provide funds for medical experts was properly denied. The continuance moved for in this connection to allow time for the commission and medical experts to make their inquiry was also properly denied.
 

 Discrimination Against Negroes in Selection of Jury
 

 By motions and bills of exceptions, the issue is presented as to whether Negroes were discriminated against in the selection of juries in Orleans Parish. We will note this issue only briefly for these motions and the stipulation of facts upon which they are predicated are the same as those we recently considered in two other Orleans Parish cases: State v. Barksdale, 247 La. 198, 170 So.2d 374 (1965) and State v. Simpson, 247 La. 883, 175 So.2d 255 (1965). In those recent cases we found no discrimination against Negroes and the decisions are controlling here.
 

 One question, however, which concerns the selection of juries, is presented here which we had no opportunity to consider in the Barksdale and Simpson cases. It involves the difference in the method of selecting grand juries in Orleans Parish and that used in the other parishes of the State. More specifically, it is pointed out that the law provides that in Orleans Parish the grand jury is selected by the judge, whereas in the other parishes, except for the foreman, the selection is by lot. It is asserted that no justifiable explanation exists for this difference which is arbitrary and unreasonable resulting in discrimination against Negroes. Thus the defense says equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution is denied.
 

 
 *977
 
 Articles of the Code of Criminal Procedure which establish these different methods of selection (La.Code Crim.Proc. arts. 184 and 196 (1928)) have been considered
 
 by
 
 us before. In State v. Rue, 236 La. 451, 107 So.2d 702 (1958), we found, and we find again, that the difference in method deprived the accused of no constitutional right.
 

 Equal protection of the laws upon which defendants rely relates to equality between persons as such, rather than between areas. The guaranty of equal protection is not a demand that all state laws operate from boundary to boundary. It compels no state to adopt an iron rule of territorial uniformity for legislation. So in the enactment of laws, the legislature may consider the needs and desires of the various sections of the state without denying equal protection. State v. Guidry, 247 La. 631, 173 So.2d 192 (1965). See also Gardner v. State of Michigan, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905). These propositions of law effectively dispose of this contention.
 

 The Issue of Reapportionment
 

 Louisiana’s Constitution (Article III, Sections 2 and 3) requires that the legislature reapportion itself every ten years. It has failed to do so. For this reason, defendants contend, the legislature is improperly constituted. Therefore the laws enacted by it, including that which condemns murder (La.Crim.Code art. 30), are unconstitutional and this prosecution cannot be upheld.
 

 If the legislators who enacted this law were not de jure officers as defendants contend, we do not hesitate to say they were de facto public officers. Generally, for reasons of public policy, the acts of a de facto officer are valid as to third persons and the public until the officer’s title to office is adjudged insufficient. In the meantime, the officer's authority may not be collaterally attacked or inquired into by third persons. Acts of de facto officers, then, are clothed with the same validity as the acts of de jure officers. State ex rel. Davis v. Police Jury, 120 La. 163, 45 So. 47 (1907); 43 Am.Jur., Public Officers, Sec. 495. From these well recognized principles, it follows that defendants may not avail themselves of the legislature’s failure to reapportion itself to avoid prosecution. We hesitate to mention the dire results which would attend a contrary decision on this contention.
 

 The Short Form Indictment
 

 Indictments in the case at bar were returned under the short form. Motions to quash these indictments were filed alleging that they were insufficient to properly inform the accused of the nature and cause of the accusation against them as required by the Sixth Amendment to the Federal Constitution, Article I, Section 10 of the
 
 *979
 
 Constitution of Louisiana and Article 227 of our Code of Criminal Procedure (1928).
 

 In State v. Eyer, 237 La. 45, 110 So.2d 521 (1959), we reiterated our approval of the short form indictment for murder. It has been uniformly upheld by this court as meeting the constitutional test that the accused must be informed of the nature and cause of the accusation against him. See State v. Barksdale, supra, and State v. Cooper, 190 So.2d 86. Accordingly, we find the motions to quash to be without merit.
 

 The Prayer for Oyer
 

 By a prayer for oyer, defendants asked for a- pretrial inspection of all oral confessions allegedly made by them, -together with copies of statements, oral or written, made by anyone who would appear as a witness for the State. Production of the •written' confessions was required by the court; but production of the other items was denied; and bills were properly reserved and perfected.
 

 Louisiana has taken a strict attitude to ward this problem by denying pretrial discovery. Counsel are familiar with the decisions of this court; but, notwithstanding these adjudications, they urged us to declare the restrictive interpretation to which this court has adhered to be in derogation of the due process requirements of the Louisiana and Federal Constitutions.
 

 In Louisiana all evidence relating to a pending criminal trial which is in possession of the district attorney or the police is privileged. Such evidence is not subject to inspection by the accused unless and until it is introduced in evidence at the trial. La.R.S. 44:3; State v. Dickson, 248 La. 500, 180 So.2d 403 (1965); State v. Pailet, 246 La. 483, 165 So.2d 294 (1964). The written confession of the accused is the only evidence excepted from this rule. State v. Dorsey, 207 La. 928, 22 So.2d 273 (1945).
 

 At common law no right of inspection of documents before trial was granted the accused. If the common law rule on this point has been greatly relaxed in England as a result of pretrial procedure,' as we understand it has, there does not seem to be a corresponding change in this country. In the United States only the written confession of the accused is subject to oyer and pretrial inspection, as in the Dorsey case. In contrast to the broad scope of discovery in civil litigation, both our state and federal criminal procedures provide for restrictive pretrial disclosure. 6 Wigmore on Evidence (3d ed. 1940) § 1859(g); Developments in the Law—Discovery, 74 Harv.L.Rev. 940 (1961) ; Louisell, Criminal Discovery: Dilemma Real or Apparent? 49 Cal.L.Rev. 56 (1961).
 

 The prayer for oyer was properly denied.
 

 
 *981
 

 Cross-Examination of the State's Witness
 

 After one of the officers testified that he obtained written permission to search the Benton Street house, defense counsel asked him on cross-examination why he had not obtained permission earlier to search Cleveland Johnson’s house on-Monticello Street. The State’s attorney objected to this line of questioning, and the trial judge sustained the objection because he felt that line of questioning was not material. A bill was reserved, and -the alleged error of the trial court’s ruling is urged as "the final contention on this appeal.
 

 The bill of exception is founded on the proposition that when a witness has been sworn and has testified to any single fact in his examination in chief, he may be cross-examined on the whole case. La.R.S. 15 :- 376.
 

 . Furthermore, it is said that since the court at first ruled that the evidence obtained as a result of the search and seizure of the Monticello Street house should be suppressed and since the court thereafter permitted the State to present additional evidence on the reasonableness of the search, it was unfair not to allow the defense to pursue this line of questioning in rebuttal to the State’s new evidence.
 

 These objections lack merit. In the first place the trial judge had previously decided that the arrests and the search and seizure of the Monticello Street house were valid,'the arrests having been made on reasonable belief or probable cause that these defendants were the actors in the robbery-killing, and the search and seizure were incident thereto. As the questioning under consideration was in connection with the predicate being laid by the State for a confession made by Cleveland Johnson at the Benton Street house, it was unrelated in time or place to the Monticello Street search. Moreover, this evidence .was to be considered by the judge alone. And he, of course, was satisfied that the officers properly searched the Monticello Street house and that the search there had no bearing upon the reasons why the officers obtained permission to search the Benton Street house. The reasons, however, are apparent.
 

 When the search was made of the Monticello Street house, the officers were in hot pursuit of the robber-killers and had no time to obtain permission or a search warrant. If they had delayed to obtain a warrant, the Johnsons and Breaux would surely have escaped. Whereas, when they arrived at the Benton Street house, immediate action was no longer required. All of the suspects were in custody, and there was time to obtain the permission they did obtain to conduct the search there.
 

 As this answer to the question posed by defense counsel was obvious to the judge, the law did not require him to permit
 
 *983
 
 the questioning to proceed; for the judge regulates the trial and has full authority to prevent needless questioning.
 

 For the reasons assigned, the convictions and sentences are affirmed.