244 So.2d 200

**STATE of Louisiana**

**v.**

**George A. SQUARE.**

**No. 50412.**

Jan. 18, 1971.

Rehearing Denied Feb. 24, 1971.

Diehlmann C. Bernhardt, John Griffin Loftin, Monroe, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., William P. Schuler, Asst. Atty. Gen., Robert W. Kostelka, Dist. Atty., for plaintiff-appellee.

SUMMERS, Justice.

Defendant George A. Square and one James Willie Millsap were jointly indicted

by the Grand Jury of Ouachita Parish for the April 13, 1968 murder of Mrs. Ezell Jordan. Square, an indigent represented by two attorneys appointed by the Court, entered a plea of not guilty and not guilty by reason of insanity. Millsap entered a not guilty plea. A severance was granted upon Square's motion, and he was separately tried. He was convicted and sentenced to death. His appeal is before us.

Counsel for Square reserved and perfected 105 bills of exceptions during the course of the prosecution, of which number 88 have been briefed and argued in support of this appeal.[1]

The victim, Mrs. Ezell Jordan, was 58 years old. She was employed as a practical nurse at a nursing home in West Monroe. On Saturday morning, April 13, 1968, at approximately 5 o'clock while on her way to work, she disappeared. When she did not report for work, those concerned about her absence contacted the Ouachita Parish Sheriff's Office. About 6 o'clock that evening her body was found in the trunk of her automobile parked between the levee and the river at the end of Lazarre Street in West Monroe. She had met her death by stab wounds over much of her body.

Investigation disclosed various personal belongings of the deceased near the scene

where the body was located, including a bank check of the deceased with the name of John Thomas Roy written on the back. Inquiry revealed that Square was an associate of Roy, who was in the penitentiary at the time. Relying upon this lead, the investigating officers took Square into custody for questioning. When further investigation disclosed inconsistencies in Square's story, he was placed under arrest. He subsequently gave statements to the sheriff's officers and pointed out the places where the events of the murder occurred.

Soon thereafter an abandoned light blue Ford automobile was found. Damage on this car was consistent with a theory that it had collided with the Falcon automobile of the deceased. When inspection disclosed that Millsap's palm prints were on the rear view mirror of the abandoned Ford, he was arrested. He later testified at the trial incriminating Square.

By motion prior to trial, defense counsel alleged that appellant was insane or mentally defective presently and at the time of the commission of the crime. A hearing was prayed for to determine whether a sanity commission should be appointed to examine appellant and report upon his mental condition. In response thereto, on April 30, 1968, the Court appointed Doctors

---

1. The following bills were not briefed or argued on appeal: Bills of Exceptions Nos. 62, 63, 64, 65, 66, 67, 70, 72, 74, 79, 80, 81, 83, 84, 85, 87, 88, 89, 90, 91, 92, 93, 94, 95, 99, 101 and 102.

J. W. Cummins and Edward G. Long, qualified experts in mental diseases, to examine into the appellant's present mental condition and his mental condition at the time of the commission of the offense.

Thereafter, before the commission's report was filed, appellant, by motion dated May 6, 1968, set forth that he was entitled to an independent mental examination by a physician of his choice. He further alleged that because of his indigency the fees of this physician, or expert witness, should be paid by Ouachita Parish. On May 15, 1968 the motion was denied.

In compliance with the Court's order of April 30, 1968, the sanity commission filed its report on June 3, 1968, wherein it concluded that appellant was capable of understanding the nature of the charges and proceedings against him. The report further set forth that appellant was of subnormal intelligence and whether that condition was sufficient to constitute a "mental defect" which would seriously impair appellant's ability to assist counsel in his defense could be better determined by standardized intelligence tests administered by a clinical psychologist.

A subsequent report filed on June 4, 1968 by the commission found appellant "sane at the time of the commission of the alleged crime." According to this latter report no reason was found "to question the subject's ability to differentiate right from wrong during the time in question."

No formal bill of exceptions was perfected to the Court's ruling of May 15, 1968 denying authorization to employ a private physician, but we are nevertheless asked to consider the issue presented as an exception to the rule embodied in Article 844 of the Code of Criminal Procedure providing that only formal bills of exceptions may be considered on appeal. In such circumstances the applicable exception is announced in that article: "In a case where the death sentence has been imposed, the appellate court, to promote the ends of justice, may consider bills that have not been timely signed by the trial judge."

This case does not, in the strict sense, fall within the exception contemplated by the article since it does not present a situation where a bill has been prepared and tardily presented to the judge for signing; but, instead, the case at bar presents a situation where, although the bill was reserved, it has never been either prepared or tardily presented for signing by the judge as Article 844 contemplates. In capital cases, however, this Court has been particularly solicitous in preventing a technicality from depriving a defendant of a review of the trial court proceedings. State v. Hall, 256 La. 336, 236 So.2d 489 (1970); State v. Harrell, 228 La. 434, 82 So.2d 701 (1955); State v. Wilson, 109

La. 74, 33 So. 85 (1902). We will therefore pass upon the contention that the trial judge erred in refusing to appoint a private physician to examine into appellant's mental condition. In so doing we are not approving the applicability of Article 844 to this fact situation.

To support the merits of the contention it is argued that the rights of indigents to the same protection available to those able to pay has been expanded during recent years by the courts, particularly the United States Supreme Court. To illustrate this tendency counsel points to the decisions in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), where the right to counsel was assured to indigents, and Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1955), requiring the furnishing of a transcript of trial court proceeding to indigents without cost on appeal. On this basis, counsel argues that since Square's mental capacity was vital to his defense, he would have a better chance had another physician of his own choosing been made available to examine him privately.

 The contention is without merit. The insanity proceedings outlined in Chapters 1, 2 and 3 of Title XXI of the Code of Criminal Procedure provide reasonable safeguards assuring a fair and impartial determination of the mental capacity of an accused party by a sanity commission composed of physicians appointed by the court without cost to the accused. This procedure is employed for the wealthy and indigent alike; and the indigent accused is no more entitled to additional physicians at State expense than he would be entitled to additional counsel simply because the wealthy accused might be able to employ private physicians or more than one attorney.

 The State's obligation to furnish a fair and impartial trial to the accused is satisfied, insofar as determining his mental condition to stand trial is concerned, by the appointment of competent and impartial physicians and experts as outlined in Chapters 1, 2 and 3 of Title XXI of the Code of Criminal Procedure. Here neither the qualifications nor impartiality of the physicians examining appellant were questioned, and there is no basis for a belief that they were not competent or qualified. We therefore uphold the ruling of the trial judge.

*Bill 1*

At a hearing held on the motions made by Square's attorneys to determine his mental condition and ability to understand the proceedings against him and assist in his defense, Doctor Long and Doctor Cummins, the members of the sanity commission, were questioned by counsel. During the course of the interrogation defense counsel asked Dr. Long, "Did you find the defendant to be of subnormal intelligence?", to which the doctor replied, "Yes, I did."

The State's attorney objected stating, "The question for this witness to determine is whether or not the defendant is found to be criminally sane or insane and not necessarily of sub-normal intelligence. That is a matter that is irrelevant and immaterial to this proceeding." When the Court sustained this objection, this bill was reserved.

■ It is true, as the State's attorney argues, that the sole question for resolution on a hearing to determine the present sanity of the accused is whether, in the language of Article 641 of the Code of Criminal Procedure, "As a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceeding against him or assist in his defense." This does not mean, however, that the subnormal intelligence of the accused—though not the complete test of competency—is not a relevant fact in that inquiry.

The State's reliance upon our decision in State v. Chinn, 229 La. 984, 87 So.2d 315 (1956), to support its position on this bill is misplaced. There the sanity commission was of the opinion that Chinn's mentality was of such a low grade it interfered "with his ability to choose between right and wrong, and as such be considered legally insane." Notwithstanding this report, the trial court, after a full hearing during which the physician members of the commission, the accused and lay witnesses

were examined, denied the plea of present insanity and ordered the defendant to stand trial. In the words of that Court, " * * * according to the universally accepted jurisprudence, mere weakness of mentality or sub-normal intelligence does not, of itself, constitute legal insanity."

The effect of the Chinn decision, therefore, is not as the State contends, a holding that the subnormal intelligence of the accused is irrelevant and immaterial. The decision stands, instead, for the proposition that the subnormal intelligence of the accused is not conclusive of mental incapacity to stand trial. And properly so, for, as in this case, a feigned subnormal intelligence which we think the record supports, should not persuade a court to find an accused mentally incompetent to stand trial when there is other more persuasive evidence to the contrary. For instance, Square, although admitting that he had an eighth grade education, paradoxically stated that he could neither read nor write. It is also apparent that he was entirely oriented to reality and possessed of sufficient mentality to remember the details of the events involved in the criminal project at issue. There is, moreover, the written report of the sanity commission concluding that Square was "capable of understanding the nature of the charges and proceedings against him." Dr. Cummins testified Square could cooperate with counsel and assist counsel in his defense.

■ Although it was error for the Court to rule that evidence of Square's subnormal intelligence was irrelevant and immaterial, the error was harmless in view of the testimony at the hearing, the sanity commission report and other evidence received by the trial judge amply establishing that, although Square may have been of subnormal intelligence, he was nevertheless capable of understanding the proceedings against him and assisting counsel in his defense. La.Code Cr.P. art. 641, 921.

Appeals in this State are not granted to indulge in academic byplays on the correctness of trial judge rulings, but only to rectify an injury caused thereby. State v. Saia, 212 La. 868, 33 So.2d 665 (1947). We are convinced that the ruling complained of in this bill had no significant bearing on the outcome of the conviction.

### Bill 2

■ In questioning Dr. Long, a member of the sanity commission, at the hearing to determine Square's present sanity, defense counsel asked, "In your letter, did you state that you felt it necessary that a clinical psychologist be appointed to determine mental * * *." (counsel not being permitted to complete his question), when the district attorney objected, " * * * as the purpose of this hearing is to determine the mental capacity of this accused to stand trial, and I think before anything else can

be gone into that is what must be determined." The trial judge also sustained this objection, and this bill was reserved.

What has been said in connection with Bill 1 is equally applicable here. This ruling was technically improper, but no harm or prejudice has resulted to Square. It is appropriate to note, in addition to what has been said in connection with Bill 1, that notwithstanding the ruling on this objection, in connection with hearings seeking to suppress certain evidence on the ground that Square did not have the mental capacity to make an intelligent or voluntary statement, the trial judge heard and considered the testimony of a clinical psychologist relating to Square's intelligence level, after which the judge concluded Square had the mental capacity to stand trial.

### Bills 3 and 4

These bills involved rulings sustaining the district attorney's objections to questions propounded by defense counsel to members of the sanity commission, asking if they needed a clinical psychologist to determine the intelligence level of the accused. The reasons assigned in connection with Bills 1 and 2 apply here, and we find these bills to be without merit.

### Bill 5

This bill was reserved to the trial judge's ruling that the accused was sane and able

to assist counsel. The bill is based upon the rulings which are the subject of Bills 1, 2, 3 and 4, which we have found to be without merit. This bill, therefore, is likewise without merit.

### Bill 6

Another motion for "additional determination of mental condition" containing a request for the appointment of a clinical psychologist to examine the accused was denied. The bill is without merit, for it is based upon the same contentions considered in the five previous bills.

### Bill 7

Defense counsel sought to subpoena two witnesses, one from Texas and one from Nevada, to testify at a hearing on defendant's application for admission to bail. The motion, filed on October 2, 1968, was heard on October 3, 1968 and denied. We find no error in this ruling.

Other than an allegation in the motion that the witness, Sammy Modicue, was a resident of Houston, Texas, his address was not furnished. The other witness, Gloria Dean Amphy, was alleged to be residing at 1941 Haptila, Las Vegas, Nevada, care of Janie Winchester.

The testimony of these two witnesses was belatedly sought to help establish an alibi for Square. But a number of witnesses testified to this fact at the hearing, and the testimony of the witnesses Modicue and Amphy would have been cumulative. Furthermore, without Modicue's address he, of course, could not be subpoenaed. La.Code Cr.P. arts. 738, 739, 740. Principally, however, this bill is without merit, for the issue of Square's right to bail is moot. The remedy in such a case is for the party aggrieved by the denial of bail to invoke the supervisory jurisdiction of the Supreme Court. La.Const. art. 7 § 2; La.Code Cr.P. art. 322.

### Bills 8, 9, and 10

Bills 8 and 9 were reserved during the taking of testimony at the hearing on the motion for admission to bail. When defense counsel questioned the witness Deputy Sheriff E. L. Walker concerning the results of tests which were subsequently made on certain objects found by him at the scene of the crime, the State's attorney objected contending the interrogation was in reality an effort by defense counsel to discover the State's evidence in advance of trial—an improper procedure to employ at a hearing for admission to bail. The trial judge sustained the objection. Later, the question was repeated, objected to and the objection again sustained, resulting in the reservation of Bills 8 and 9. Bill 10 was reserved to the denial of the motion for admission to bail.

These bills are without merit. All issues they present are moot. Like Bill 7 these

contentions should have been asserted in applications for writs under this Court's supervisory jurisdiction. La.Const. art. 7, § 2; La.Code Cr.P. art. 322; cf., State v. Reed, 119 La. 894, 44 So. 705 (1907).

### Bills 11 and 12

These bills were reserved at a hearing held on a motion to suppress as evidence certain clothing and other objects taken from Square at the time of his arrest. According to defense counsel's brief, the motion was based upon the claim that the arrest was made without probable cause as a consequence of which the items of clothing taken from Square at that time were inadmissible as evidence, being the fruit of an illegal seizure.

During interrogation of the chief investigating officer, defense counsel asked, "Were tests run on any of this property to indicate—to attempt to establish whether it was connected with the offense", to which the witness replied, "Yes, Sir." Defense counsel then asked, "What were the results of those tests?", and the State's attorney objected that the question sought to elicit information in advance of trial concerning the nature and character of the State's evidence, an impermissible inquiry under State law.

The trial judge ruled that the objection should be sustained, because the results of laboratory tests on these objects were not relevant to the issue of the legality of Square's arrest, and, moreover, the question sought impermissible pretrial discovery of evidentiary details. Bill 11 was reserved to this ruling. Bill 12 was reserved to a similar ruling on an identical question to the same witness concerning other items of physical evidence taken from the defendant's person at the time of his arrest and incarceration.

[9] These bills are without merit. The trial judge properly found the answers to the questions seeking results of laboratory tests made some time after the arrest to be irrelevant to the issue of the legality of the defendant's arrest. Tests performed at a later time on clothing and other items gathered at the time of an arrest cannot serve to support or impair the validity of the arrest. The facts as they existed, and as they were known to the arresting officers and upon which they based their beliefs at the time of the arrest, are the facts which are relevant and bear upon whether the arresting officers had reasonable or probable cause to believe that a felony had been committed and that Square had committed that felony. La. Code Cr.P. art. 60; State v. Johnson, 249 La. 950, 192 So.2d 135 (1966).

In our view the State's attorney and the trial judge properly recognized this interrogation as an effort by defense counsel to obtain pretrial discovery of the State's evidence. A party accused of crime

is entitled to the pretrial production and inspection of written or video-taped confessions, but has no right to require the production of other items of evidence. State v. Crook, 253 La. 961, 221 So.2d 473 (1969); State v. Hunter, 250 La. 295, 195 So.2d 273 (1967); State v. Johnson, 249 La. 950, 192 So.2d 135 (1966); State v. Pailet, 246 La. 483, 165 So.2d 294 (1964).

The rule against compelling pretrial production of the State's evidence cannot be circumvented by utilizing hearings on other issues to make irrelevant inquiries which serve the same purpose.

*Bill 13*

The presentation in this bill is to a large extent incomprehensible. It is improperly prepared like many other bills in this record, for the evidence and pleadings relied upon are not attached as the law directs, often requiring an aimless excursion into the entire record, consisting of eight volumes, to ascertain the facts and pleadings which may serve to define and support the contentions raised in connection with the bill. However, by reference to defendant's brief and to a per curiam of the trial judge, which assimilates the facts and issues upon which this bill purports to rest, we are able to comprehend the defense contention and dispose of it satisfactorily. Proper preparation and presentation of these bills are not insisted upon for the sole reason that this is a capital case.

By motion defendant alleged he was arrested on a charge of murder and aggravated kidnapping on April 14, 1968; that soon thereafter the arresting officers took the following articles from his person: one pair of shoes, a pair of black or blue pants, one brown shirt, underclothing and socks. He also set forth that other property taken from him consisted of a padlock key, a $12.24 payroll check, a receipt for his wallet and a receipt for $7.50 from Dr. N. Klan, and that these latter items were kept by the city jailer at Monroe. He set forth in his motion that no book is kept by the authorities who arrested and incarcerated him, showing a list of property taken from arrested persons as required by Article 228 of the Code of Criminal Procedure. According to the motion, he was not informed of the charges against him, nor of his right to communicate with and procure counsel, nor of his right to request a preliminary examination pursuant to Article 229 of the Code of Criminal Procedure. Neither was he accorded the right to use a telephone to communicate with his friends, relatives or counsel as required by Article 230 of the Code. Hence, he alleges, his arrest was unlawful and all items taken from him, together with all evidence obtained as a result of the unlawful arrest, were inadmissible as evidence and should be suppressed.

Another motion set forth that the indictment against Square should be "suppressed"

(quashed), for it was based upon evidence presented to the grand jury which was obtained as a result of his unlawful arrest.

After the complaints relating to the booking procedure had been ruled upon, the Court, the State and the defense interpreted the remainder of the motion and prayer as presenting the constitutional issue: Did probable cause exist for the arrest? In his ruling on these motions, the trial judge considered the entire testimony taken at the hearings held on November 19 and 20, 1968.

This record disclosed that a check belonging to the deceased was found at the scene of the crime bearing the name of one John Thomas Roy. With this knowledge the investigating officers went to the home of Roy's aunt; they learned there that Roy and Square had been close associates, but Roy was then incarcerated in the penitentiary, where he had been for some time. As the trial judge observed in his per curiam, "It was therefore logical for the investigating officers to conclude that someone who had close association with Roy must have been at the scene or have some knowledge of any relationship between Roy and the deceased." One of the officers had knowledge, which he imparted to his associates, that Roy and Square had been "fall partners"—that is, had served sentences for joint participation in a burglary offense. Two deputies then sought

and located Square and, following constitutional warnings, conducted custodial interrogation. Square voluntarily told them of his whereabouts during the critical period and denied implication in the crime.

The officers then interrogated other persons, who gave contradictory information concerning Square's whereabouts. By further investigation the officers learned that a pair of pants found at the scene bore a laundry mark similar to those used by Square's mother. They then arrested Square on a charge of murder, and it was following this arrest that the evidence sought to be suppressed was obtained from his person.

On the basis of this evidence the trial judge properly denied the motion to suppress, for the reason that the entire evidence supplied ample grounds for a reasonable belief by the arresting officers that Square was probably implicated in the crime. La.Code Cr.P. art. 60; State v. Johnson, 249 La. 950, 192 So.2d 135 (1966).

In brief to this court defense counsel urge that we declare the arrest of Square to be illegal because the officers failed to comply with the mandates contained in Articles 228, 229 and 230 of the Code of Criminal Procedure relating to the booking of arrested persons and the duty of the officer in charge of the jail or police station to inform the prisoner of the charges

against him, his right to counsel and his right to request a preliminary examination, procure counsel and communicate with friends.[2] Unless the arrest is nullified these provisions which are vital safeguards and the evidence seized in connection therewith suppressed, counsel contends, there will be widespread disregard of against secret arrests and improper police tactics.

2. La.Code Cr.P. art. 228:

It is the duty of every peace officer making an arrest, or having an arrested person in his custody, promptly to conduct the person arrested to the nearest jail or police station and cause him to be booked. A person is booked by an entry, in a book kept for that purpose, showing his name and address, the offense charged against him, by whom he was arrested, a list of any property taken from him, and the date and time of booking. Every jail and police station shall keep a book for the listing of the above information as to each prisoner received. The book shall always be open for public inspection. The person booked shall be imprisoned unless he is released on bail.

La.Code Cr.P. art. 229:

The officer in charge of the jail or police station shall immediately inform the prisoner booked:

(1) Of the charge against him;

(2) Of his rights to communicate with and procure counsel; and

(3). Of his right to request a preliminary examination when he is charged with a felony.

The answer to his contention is that a penalty for failure to comply with these requirements is provided by law. A peace officer who fails to book his prisoner promptly, as required by Article 228, or the booking officer who fails to give the prisoner the information required by Article 229, will be guilty of malfeasance in office under Article 134 of the Criminal Code.[3] See La.Code Cr.P. art. 228, Com-

The officer in charge shall, within forty-eight hours from the time of the booking, notify the district attorney in writing of all persons booked for violation of state statues, and shall furnish without cost a certified copy of any booking entry to any person requesting it.

La.Code Cr.P. art. 330:

The person arrested has, from the moment of his arrest, a right to procure and confer with counsel and to use a telephone or send a messenger for the purpose of communicating with his friends or with counsel.

3. La.Cr.Code art. 134:

Malfeasance in office is committed when any public officer or public employee shall:

(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or

(2) Intentionally perform any such duty in an unlawful manner; or

(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.

ment (d). These booking requirements of the law are administrative or ministerial functions, the enforcement of which are contemplated and provided for by law, and failure to fulfill the duties imposed by these articles has no bearing upon the legality of an arrest which is otherwise lawfully made on reasonable belief or probable cause. A departure from acceptable concepts of judicial restraint would occur if this Court were to superimpose an exclusionary rule over this legislative plan, a rule which would in all probability only benefit the guilty accused and which would not be likely to deter the negligent or culpable official.

### Bills 14 and 15

After his arrest on April 14, 1968 certain statements were made by Square to members of the Ouachita Parish Sheriff's Department on April 16, 1968. By motion to suppress, defense counsel alleges that at this time Square was not represented by counsel; he was not advised of his rights before the custodial interrogation; he was of subnormal intelligence and incapable of waiving his rights under the Miranda rules, and the statements were involuntarily made having been compelled by threats, intimidation, coercion and/or promises of reward.

At the hearing held on this motion it was established that after Square was taken into custody he was given the Miranda warnings and questioned on Sunday, April 14, but no statements were recorded. The next day he gave the officers three recorded statements—two in the morning, the first at 10 and the second at 10:43 in the morning, while the third was given at 3:58 in the afternoon. Before each statement was given and recorded, Square was given the Miranda warnings and signed separate waivers of those rights. There is virtually no credible testimony refuting the overwhelming proof that no threats, intimidation, coercion or promises of reward were made to induce the making of the statements or the signing of the waivers.

During defense counsel's cross-examination of one of the investigating officers who participated in the questioning and recording of Square's statements, the officer was asked, "How much of the information in the first statement was gathered at the previous interrogation Sunday afternoon?" The State objected to the question as an attempt by defense counsel to inquire into information obtained by the officer in the course of his investigation. It was also argued that the information sought by the question had no relation to the issue before the Court, which was whether the Miranda

Whoever commits the crime of malfeasance in office shall be fined not more than five hundred dollars, or impris-

oned for not more than six months, or both.

warnings had been given to Square, and whether his waiver of the rights accorded under the Miranda rules and his statements were freely and voluntarily given. This objection was sustained, and Bill 14 was reserved.

At some time between the second and third statements, Square accompanied the investigating officers on a trip outside the jailhouse; we infer it was for a visit to the scene of the crime. While cross-examining another of the officers who interrogated Square, defense counsel asked, "What were the oral admissions made to you and Causey (the other officer) by defendant following this trip?" To which the State attorney again objected, arguing that the information sought was not relevant to the inquiry at hand, which had to do with the admissibility of the statements in question rather than the substance of those statements. When this objection was sustained Bill 15 was reserved.

■■■■ Each of these bills is without merit. As the trial judge observed in his per curiam, the questions sought to elicit information irrelevant to the issue of the voluntariness of the statements and their admissibility otherwise under the allegations of the motion to suppress. Again the Court observed that defense counsel was engaged in an effort to make impermissible pretrial discovery of evidentiary facts. The issue thus presented is the subject of our ruling on Bills 11 and 12.

### Bills 16 and 17

At the hearing on the motion to suppress the statements to which we have referred in the foregoing discussion of Bills 14 and 15, defense counsel, while examining his witness, Ebert Van Buren, a clinical psychologist, asked, "There has been some variance in your testimony, so I ask you again, after tape number one, was the explanation of the waiver and the reading of the waiver adequate for George Square, at that time, to understand the nature of what was asked him?" The question was objected to as repetitious, and the objection was sustained. A bill was reserved to this ruling. Bill 17 is to the same effect.

■■■■ The record will reveal that the witness had expressed his opinion as to the precise question at least once previously and had otherwise expressed the same opinion in general throughout his previous testimony. The answer sought was unquestionably repetitious and cumulative. These bills lack merit.

### Bills 18 and 78

■■■■ Bill 18 was reserved to the trial judge's ruling denying the motion to suppress referred to in the previous bills. The thrust of the argument on this bill is that Square did not possess the mentality to understand the Miranda warnings or to comprehend the waivers he signed of those rights. In addition to the testimony in the record relied upon by the trial judge to

support his ruling, the following pertinent observations taken from his per curiam convince us that we should not overturn this ruling which is a fact question to be determined, in the first instance, by the trial judge, whose finding will not be disturbed in the absence of manifest error. The trial judge observed:

\* \* \* In addition, however, it may be noted that this Court, from conferences with counsel, had knowledge that insanity pleas were contemplated and later filed, that this was a most serious case which involved elements of facts and circumstances demanding the utmost zeal and effort on the part of all concerned to protect this defendant from violation, unintentional or otherwise, of any of his legal rights. Accordingly, this Court gave serious attention and careful observation to the defendant, his counsel and all officers or officials having any relationship to the case.

\* \* \* \* \* \*

\* \* \* from close observation at all other appearances, particularly noting his demeanor and reaction and response to questions, and considering all the evidence at this hearing, the Court was and is thoroughly convinced that he was from his apprehension forward of sufficient functional intelligence and experience to comprehend his rights and intentionally and knowingly choose his course of action. \* \* \*

The trial judge's opportunity to observe Square at close hand on numerous occasions was of crucial importance in the determination of his mental competency to assist in his defense.

For these reasons Bill 78 also lacks merit, for it was reserved when the oral and recorded statements made by Square were introduced into evidence at the trial.

### Bills 19, 20 and 21

These bills were reserved at a hearing on a motion to quash the grand jury indictment charging Square with murder. The motion is based upon allegations that the grand jury heard testimony which disclosed the content of certain inculpatory statements made by Square. These statements, it was alleged, were given by Square without the benefit of counsel and without an intelligent waiver of the right against self-incrimination.

It was further alleged in the motion that the grand jury was presented with evidence obtained as a result of a general exploratory search warrant issued contrary to the State and Federal Constitutions; and that evidence was presented to the grand jury which was obtained as a result of the unlawful arrest of Square. This latter illegality, it was asserted, stemmed from violations by officials, who arrested and incarcerated Square, of the duties imposed upon them by Articles 228, 229 and 230 of the Code of Criminal Procedure, that is, Square

was not advised by the officers in charge of the jail of his right to counsel, his right to contact friends and relatives, and his right to request a preliminary examination.

The motion is predicated upon the proposition announced in State v. Harrell, 228 La. 434, 82 So.2d 701 (1955), that "An indictment is the foundation of the criminal case and, if it is grounded, in whole or in part, on evidence secured in violation of a constitutional right, it is an absolute nullity." State v. Callahan, 247 La. 525, 172 So.2d 668 (1965), and State v. Smelling, 240 La. 915, 125 So.2d 409 (1960), are also cited as authority. These cases concerned the failure to inform a person of his constitutional right against self-incrimination when called to testify before a grand jury, and the subsequent use of that testimony against him in a prosecution. The cases are, therefore, not authority for the fact situation presented in these bills.

When defense counsel called the foreman of the grand jury to the witness stand to disclose the facts and testimony presented to the grand jury to support the allegations of the motion, the State objected to any testimony by the witness which would reveal the proceedings of the grand jury or testimony given before that body. Bill 19 was reserved when the trial judge sustained this objection.

Defense counsel then requested the issuance of a *subpoena duces tecum* addressed to the district attorney ordering him to produce the record of the grand jury hearings and deliberations relating to the indictment of Square. Objection by the State was sustained, and Bill 20 was reserved. Bill 21 was taken when the motion to quash the grand jury indictment was denied.

The motion to quash was properly denied. The validity of the statements and the arrest were at issue in other bills which we found to be without merit. As to the particular search warrant which is referred to in the motion to quash and the items seized as a result of the search authorized thereby, the deputy sheriff in charge of the investigation testified that the objects seized were items of clothing which, when subjected to laboratory tests, proved to be without benefit to the prosecution, and this clothing was never used in evidence before the grand jury or otherwise.

Aside from our recognition of the correctness of the trial court ruling that the evidence alleged to have been presented to the grand jury was lawful evidence which might properly be used by the prosecution, we are agreed that neither the testimony of the foreman of the grand jury nor the transcript of the grand jury proceedings was admissible at this hearing. At our last term we had occasion to rule on a related question in State v. Terrebonne, 256 La. 385, 236 So.2d 773 (1970). In that case certiorari was granted to review the trial

judge's ruling that the testimony of a witness before the grand jury which indicted defendant was inadmissible at defendant's trial to prove a prior inconsistent statement of that witness. In approving this ruling we reviewed the pertinent codal articles and the jurisprudence having a bearing upon grand jury secrecy. We recognized then, and we reiterate today, the legislative mandate to preserve grand jury secrecy unless a clearly defined exception is announced by the Legislature. See also State v. Hudson, 253 La. 992, 221 So.2d 484 (1969).

The immediate question presented here, however, is answered by the authority of Sections 470 and 471 of Title 15 of the Revised Statutes.

Section 470 provides:

> No juror, grand or petit, is competent to testify to his own or his fellow's misconduct, or to give evidence to explain, qualify or impeach any indictment or any verdict found by the body of which he is or was a member; but every juror, grand or petit, is a competent witness to rebut any attack upon the regularity of the conduct or of the findings of the body of which he is or was a member.

Section 471 provides:

> No grand juror or district attorney is competent to testify as to anything that took place before the grand jury during its sessions, or to testify upon what evidence any indictment was found, or that

it was found upon insufficient evidence, or without evidence; but the grand jurors and the district attorney are competent witnesses both for the state and for the defense in any prosecution for perjury or false swearing, alleged to have been committed before the grand jury.

These enactments clearly support the ruling refusing to permit the foreman of the grand jury to testify, and Article 434 of the Code of Criminal Procedure supports the judge's refusal to order the production of the transcript of the grand jury proceedings.

Article 434 provides:

> Members of the grand jury, all other persons present at a grand jury meeting, and all persons having confidential access to information concerning grand jury proceedings, shall keep secret the testimony of witnesses and all other matters occurring at or directly connected with, a meeting of the grand jury. However, after the indictment, such persons may reveal statutory irregularities in grand jury proceedings to defense counsel, the district attorney, or the court, and may testify concerning them. Such persons may disclose testimony given before the grand jury, at any time when permitted by the court, to show that a witness committed perjury in his testimony before the grand jury. A witness may discuss his testimony given before the grand

jury with counsel for a person under investigation or indicted, with the district attorney, or with the court.

Any person who violates the provisions of this article shall be in constructive contempt of court.

These bills are without merit.

### Bills 22 through 28

Defense counsel set out in a motion for bill of particulars that because Square's indictment was in the short form he was entitled to know the facts surrounding the alleged crime in order to prepare a proper defense. He relies upon Article I, Section 10, of the Louisiana Constitution, the Fourteenth Amendment and the Bill of Rights of the Constitution of the United States to support his request for a number of particulars. The indictment charged:

* * * George A. Square and James Willie Millsap late of the Parish aforesaid, in the Fourth Judicial District of the State of Louisiana, on or about the 13th day of the month of April Anno Domini, nineteen hundred and sixty-eight in the Parish, District and State aforesaid— murdered Mrs. Ezell Jordan, contrary to the provisions of R.S. 14:30, etc.

In answer to the interrogatories propounded in the motion for bill of particulars, the State informed the defense that the victim left her home in Ouachita Parish, at 4:30 a. m. on April 13, 1968, enroute to work and she never arrived; and, according to the best information available, the first contact the victim had with her assailants took place near Jewel Street in the vicinity of Richardson High School in Ward Five of Ouachita Parish. Her body was found at 6:00 p. m. alongside the Ouachita River at the end of Lazarre Street, and the alleged kidnapping and murder took place sometime between 4:30 a. m. and 6:00 p. m., April 13, 1968. The answer also set forth that Square and Millsap, acting in concert, inflicted death upon the victim by stabbing with a knife while in the act of perpetrating aggravated kidnapping, armed robbery and simple robbery. The particulars also advised that Square was taken into custody on April 14, 1968 at 4:00 p. m. in Ouachita Parish by Deputies W. O. Causey and Hoyt Moncrief.

The State refused to disclose what was taken from the person of Square or Millsap or where those objects were located, or what was taken from the home of each.

Questions concerning search warrants were answered by referring counsel to the warrants and the returns thereon on file in the clerk's office.

▮▮▮ A bill was reserved when, in answer to the question, "Which defendant actually seized, enticed or imprisoned the victim?", the State answered that "both defendants acting in concert committed the

crimes charged and are principals as defined by Louisiana law." By statute in Louisiana (La.R.S. 14:24), "All persons concerned in the commission of a crime, whether present or absent, and whether they directly or indirectly counsel or procure another to commit the crime, are principals." On this authority, the State's answer would be adequate. Other inquiries in the motion and the particulars furnished in response thereto make it clear that the State intended to prove that both defendants were "acting", and this information would answer the question of the motion, "Which defendant actually did the killing?"

Information furnished in response to the motion for bill of particulars, which is briefly set out in connection with these bills, was adequate to inform the accused of the nature and cause of the accusation against him and to permit him to prepare a defense. The bill of particulars may not serve to compel a disclosure by the State of the details of the evidence it relies upon to sustain the conviction. La.Const. art. 1 § 10; La.R.S. 15:464 & 465; La.R.S. 15:484 & 485; State v. Wright, 254 La. 521, 225 So.2d 201 (1969).

Furnishing bills of particulars is permissive, and the trial court ruling will not be set aside unless there is an abuse of discretion.

These bills are without merit.

### Bills 28 through 34

These bills concern the adequacy of the answers to a supplemental motion for bill of particulars requesting the names and addresses of each of the prosecuting witnesses, the evidence to be given by each, the location of the evidence, the content and location of statements made by the accused, whether there is other evidence, its nature and location, the text and location of all police reports; and, specifically, any evidence reasonably useful to the defense as required by Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

The interrogatories requesting the names and addresses of each prosecuting witness, the evidence to be given by each and the "location" of that evidence was answered by the State in these words:

> The defendant by Bill of Particulars is entitled to know the nature of the charge against him and those facts which enable him to understand the nature and extent of the charge, but the State is not required to disclose its case before trial and the defendant is not entitled to the work product and the complete investigation performed by the State, and, therefore, the State is not required to answer this question.

When the trial judge refused to compel further answers to these questions, counsel for defendant objected and reserved Bills 28, 29 and 30.

In brief the defense argues that the limiting of pretrial discovery in criminal cases by this Court's decisions is archaic and out of place in our modern world. Counsel say fundamental fairness requires that a defendant in a criminal case be granted the same rights of liberal discovery available to litigants in civil cases.

On a number of occasions in the past the issue thus stated has been squarely before us, and we have steadfastly refused to broaden the scope of pretrial discovery in criminal cases, limiting the right to written or video-taped confessions. State v. Crook, 253 La. 961, 221 So.2d 473 (1969), quoting from State v. Hunter, 250 La. 295, 195 So. 2d 273 (1967), traces the jurisprudence on this question and recognizes that this Court's attitude is dictated by "vital considerations related to fair balance in criminal procedure and the protection of the public against the ravages of crime." No argument has been advanced here which would persuade us to depart from this settled rule.

When the State furnished information with regard to the written statements and where they could be inspected or copied, it was required to do no more. Information relating to oral statements was not obtainable by bill of particulars prior to trial as we have specifically held in State v. Johnson, 249 La. 950, 192 So.2d 135 (1966).

The request for the contents of police reports and for information about their location is also without merit. In addition to the well established rule limiting pretrial discovery, Section 3 of Title 44 of the Revised Statutes permits any sheriff or district attorney, police officer, investigating officer or investigating agency of the State to withhold from disclosure any evidence in their possession until after the records have been used in court or the criminal charge has been disposed of.

In answer to the specific request for "any evidence reasonably useful to defendant as required by Giles v. Maryland, 386 U.S. 66 [87 S.Ct. 793, 17 L.Ed.2d 737] (1967)" the State replied, "The State has no evidence in its possession tending to establish the innocence of the defendant, George A. Square." The trial judge held this answer to be sufficient.

We do not find the decision in Giles to be authoritative on the contention. There is no majority vote on any point of law in that case which would support the defense here. However, we accept as authoritative the rule in Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), cited in Giles, where the Court recognized the applicable rule to be established that a conviction obtained through false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not solicit-

ing false evidence, allows it to go uncorrected when it appears. And this principle does not cease to apply merely because the false testimony goes only to the credibility of the witness.

■ In the case at bar there is no showing that the response of the State is incorrect. Accepting the response at face value, there is no violation of the rule in Napue. Defense counsel assert in brief, however, that the State seized clothing and other physical evidence from Square at the time of his arrest and had negative reports from the Federal Bureau of Investigation in its possession relating to these items, and these tests, which would have helped Square's case, were never used in evidence. Counsel represent, moreover, there were statements from witnesses tending to strengthen defendant's alibi and these were also in the State's possession. Details of the tests or contents of the statements requested are not furnished; and although a hearing was held on the adequacy of the State's response, no effort was made then to demonstrate how the test results or content of the statements would benefit the defense. A vague charge of this kind, a fishing expedition in the true sense, may not serve to compel the State to disclose evidence in its possession in advance of trial. We are called upon to speculate that the FBI report and the statements would benefit the defense—an improper basis for any responsible ruling.

These bills are without merit.

■■■■

*Bill 35*

■ In a motion filed on January 6, 1969, defense counsel averred on information and belief that the sheriff had a tape recording given by Sammy Modicue, Jr., a prospective witness, during April of 1968 and a statement given about the same time by his wife Betty Modicue. These statements, it is alleged, were believed to be favorable to the defense under the rule of Giles v. Maryland and other cases; that the statements were believed to be helpful because they corroborated testimony of other witnesses, including that of Modicue to the effect that Square was not with Millsap on the night of the murder, but, instead, was at a party.

When defense counsel requested a ruling on the motion, the Court took the question under advisement and denied the motion the next day. In his per curiam the trial judge supplied a complete and thorough explanation for his ruling with which we agree.

The case had been scheduled for trial on January 6, 1969; and the jury venire was assembled. However, a motion for change of venue had been filed by defendant three days earlier, and this motion was called for hearing on January 6, prior to beginning the trial. At the close of the first day's hearing on the venue motion, defendant filed this motion for production of state-

ments allegedly taken by deputies while investigating the crime.

Again, as in the earlier motions for bill of particulars, the defense urged that these statements were "favorable to the defense" and relied upon Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), as authority to compel their production as a "due process" requirement under the Federal Constitution. The previous motion for bill of particulars had merely requested any and all evidence favorable to the defense without specification. This motion was the first direct request for specific, concrete items of potential evidence allegedly withheld by the State.

At the time, both Sammy Modicue and Betty Modicue were under subpoena and were present as potential witnesses for the defense at the trial on the merits. From them the defense had ample opportunity to learn everything they knew about Square's whereabouts and everything they told the officers. Sammy Modicue was actually used as a defense witness when the case was tried later. He not only described his associations with defendant relating to the alibi, but also, under defense questioning, related what he said he had previously told the investigating officers. No mention of an earlier statement and no effort at impeachment resulted on cross-examination of the witness.

This bill has no merit.

*Bills 36 and 37*

At the trial of the motion for change of venue, the defense moved for a continuance or recess of the hearing based upon the nonappearance of two witnesses, representatives of the Associated Press and the United Press International. Although defense counsel represents that these subpoenas were requested and issued early enough for these prospective witnesses to be served, the Sheriff of Orleans Parish did not serve the subpoenas. It is claimed that the defense needed the testimony of these witnesses because all the radio and television stations and both newspapers used these services for source material in the coverage of this case.

An excellent per curiam to these bills satisfactorily demonstrates them to be without merit. We adopt the per curiam as our reasons for so holding.

Widespread and "excessive" publicity by newspaper, television and radio was alleged as one of the grounds for change of venue. Interrogation of all prospective jurors assembled for the trial on the merits (which was not held during that jury term) revealed no unusual influence from any of these sources of publicity. All copies of the two daily newspapers having any material on the case were introduced into evidence and revealed remarkably and commendably subdued treatment of the case. Representatives of

both television stations and all five radio stations testified; and their testimony was of similar import. All these media used material locally prepared for the most part and virtually all this was obtained from official releases by the sheriff's office or interviews by local people with either the sheriff or his chief deputy. At least one witness testified that his television station originated much of the information which went out on the teletype operated by AP and UPI. Witnesses revealed that the named bureau representatives of the two wire services were locally present only on one or two occasions in the earliest stages of the investigation and could not have originated or circulated any appreciable volume of publicity. Moreover, it was clear from the whole record that any and all publicity which could have been released by these gentlemen was of general import and character similar to that which appeared in the newspapers filed in evidence and that described by the witnesses. Accordingly, any testimony given by the two absent witnesses would clearly have been cumulative and of no additional probative value in considering the motion for change of venue. The Court therefore denied the motion for continuance or recess of the hearing until such time as they could appear, and also denied the motion to take their testimony for attachment to the bill of exception.

In deciding not to grant the continuance or to recess the hearing to enable these two witnesses to testify, the trial judge was assured that the testimony of the two absent witnesses would not have affected the answers of the jurors on voir dire examination or the testimony of witnesses at the trial. This was the correct test, and his rulings were correct. La.Code Cr.P. art. 622.

### Bill 38

This bill was taken to the denial of the motion for change of venue. Excessive publicity by broadcasts of three radio stations in Monroe and one station in West Monroe; two television stations in Monroe and one in El Dorado, Arkansas, and news releases by two newspapers in Monroe and one in West Monroe are alleged as a basis for the venue change. Wide publicity is alleged to have been given through this media to the disappearance of the victim, the efforts to apprehend the persons responsible for the crime and to the arrest of both Square and Millsap; defense counsel's son received a telephone call threatening his mother because of his father's role as defense counsel, and the district attorney's office was believed to have received an inordinate number of phone calls indicating an unusual amount of interest in the case.

In addition to the reasons given in the per curiam quoted in connection with our

disposition of Bills 36 and 37, our review of the record satisfies us there was no reason for a change of venue. The trial judge listened to a number of representatives of local television and radio stations, viewed newspapers carrying information of the crime and the arrests which followed, and permitted interrogation of all prospective jurors assembled for the trial. Actually, the record tends to show that the crime in question was given less publicity than any in the area during the last fifteen years because of news media awareness of recent court ruling on this subject. Testimony of prospective jurors, representing a cross section of the community, established little, if any, present concern over the case, because of the many months which had transpired since the commission of the crime.

This bill is without merit.

### Bill 39

■■■■■ A motion to produce the results of certain tests performed on the shirt and other clothing of Square by the Federal Bureau of Investigation, the sheriff and others, which tests were believed to be favorable to Square, was denied and this bill was reserved.

This motion was filed on January 7, 1969, prior to trial. Pretrial discovery of State evidence is not permitted, as we have pointed out heretofore. State v. Crook, 253 La. 961, 221 So.2d 473 (1969). Again the Giles v. Maryland decision is relied upon. Our

previous discussion of that case in connection with other bills suffices to answer the identical contentions advanced here.

Moreover, the per curiam to this bill informs us that as to tests run on this evidence, at least one deputy sheriff testified during an earlier hearing that these tests were negative for inculpatory evidence against defendant. In addition, one shirt and several other items of property taken from, or claimed by defendant, had been returned to him by court order and a continuance of the scheduled trial date had been granted, partly in order that defendant might have adequate time, if desired, to conduct his own tests on these objects. Finally, at the trial itself, state witnesses were cross-examined and disclosed the results of tests conducted for the State to be negative.

### Bill 40

■■■■■ Without mentioning the articles involved, the defense filed a motion on January 13, 1970 setting forth that "certain other articles" were taken from him at the time of his arrest upon which tests were performed, and he demanded the opportunity to inspect these articles and be furnished with the results of tests conducted on them. Giles v. Maryland is again relied upon to support this motion.

The motion was denied, not only because it sought impermissible discovery, but be-

cause it was too vague and general, failing to furnish any description of the "articles" referred to. In any event, as the per curiam points out, the testimony of state witnesses during the trial on the merits covered all tests, giving the jury the opportunity to evaluate the test results. Giles v. Maryland and the Napue Case are therefore inapplicable.

### Bill 41

■ On January 21, 1969, which was the second day of trial, the defendant filed a motion for the production of Ada Mae Woods, an out of State witness, whose testimony was alleged to be necessary to buttress his alibi defense. The motion was denied, and this bill was reserved. This bill has no merit because this witness did attend the trial and testify on behalf of the defendant. Defense counsel disputes this finding in his brief, stating that the witness involved in the motion was Gloria Dean Amphy, who never testified and the motion for her production was filed on January 13, 1969, instead of January 21, 1969, as the trial judge found.

Despite the fact that the bill makes no reference to any page of the record where this ruling occurred, by a painstaking perusal of the record we find a vague reference to this motion at a hearing held on January 21, 1969. In this reference counsel states he was filing a motion for production of a witness. The district attorney then offered to stipulate what "she" would testify to, thus confirming the filing date and the name of the witness involved in this ruling.

### Bill 42

■ By a motion to suppress, the defense complained of a "cumulation" of "factors" as a basis for suppression of all items of evidence seized in connection with the prosecution, for it was alleged they were gained in violation of due process requirements of both the State and Federal Constitution.

The motion alleged that no list was made of the property taken from Square when arrested; property was taken from his residence and the residence of Sammy Modicue on the basis of false warrant which did not list the property to be seized; no receipts for the property seized were given to the person present as required by Article 166 of the Code of Criminal Procedure; the property was not retained under the direction of the judge as Article 167 of the Code of Criminal Procedure directs, but, instead, the property was kept by the sheriff and the sheriff's office was very "incooperative" in returning the property seized.

In connection with the trial of this motion and numerous other motions to suppress or for the return of property, the trial judge informs us that the State was required to "account for" every individual

item of property seized from or claimed by the defendant. All property suppressed as evidence or not being held as evidence (because of negative tests) had been returned to defendant in spite of rather weak evidence as to the ownership of some items. Finally, the Court required the chief criminal investigator for the sheriff's office to list and itemize every such item; and the State retained only those items it intended to use as evidence.

It will be noted, too, that the trial judge had previously ruled adversely to defendant on motions to suppress most of the remaining items involving issues relating to formalities of booking procedure, lack of receipts, errors on search warrant returns and other technicalities of a ministerial or clerical nature. No violation of constitutional due process results from these discrepancies, and defense counsel has cited no authority to support his contentions.

### Bill 43

Soon after Square was arrested and during his incarceration in the city jail (the parish jail was being remodeled) hair samples were obtained from his pubic area. This was accomplished by having him comb his pubic area while squatting over a clean cloth and collecting the hair that fell. Square did this willingly and without objection at the request of sheriff's deputies.

About two or three months after his arrest, while in the city jail, Square, at his request, was given a haircut by another inmate. Samples of his hair were gathered and sent with samples of the pubic hair to the Federal Bureau of Investigation for examination and testing.

The contention is made that this procedure violated principles of fundamental fairness implicit in the Constitution. In Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), it was held that the withdrawal of blood samples from the body of the defendant and subsequent use of tests made on these samples did not offend constitutional concepts of justice. See Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Regard for the requirements of due process impose upon courts an exercise of judgment to ascertain whether proceedings resulting in a conviction "offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." It is a respect for those immunities "so rooted in the traditions and conscience of our people as to be ranked as fundamental." Rochin v. California, Ibid.

■ As thus applied this concept of due process is not offended here. Nor do we find the procedure employed here to be con-

trary to the due process requirements of our State Constitution.

In Louisiana we have referred to the constitutional guarantee of due process of law as that which "preserves those enduring principles enunciated in our Bill of Rights, and the preservation of those basic rights termed as inalienable in our Declaration of Independence." State v. Straughan, 229 La. 1036, 87 So.2d 523 (1956). Acting on these principles and the claim of violation of the constitutional right against self-incrimination we have held that a defendant may be ordered to: speak so that his voice may be identified, State v. LaCoste, 256 La. 697, 237 So.2d 871 (1970); have her height measured before the jury, State v. Roy, 220 La. 1017, 58 So.2d 323 (1952); exhibit his feet for comparison with foot tracks, State v. Prudhomme, 25 La.Ann. 522 (1873) and State v. Graham, 116 La. 779, 41 So. 90 (1906); have scraping from beneath fingernails and clothing taken to test presence of human blood, State v. McLaughlin, 138 La. 958, 70 So. 925 (1916); and have clothing taken while incarcerated with a view of identifying it as that worn at the time of arrest, State v. Aspara, 113 La. 940, 37 So. 883 (1904).

This bill has no merit.

### Bill 44

On January 20, 1969, during voir dire examination of a prospective juror, the district attorney, after questioning the juror, stated, "We find the juror qualified and tender him", after which defense counsel asked, "Do you accept the juror?", and the district attorney replied, "No, but I said I found him qualified." Objection was then entered by defense counsel who moved that the district attorney be required to accept or reject the juror before tendering him to the defense. The motion was overruled and this bill reserved.

By the terms of Article 786 of the Code of Criminal Procedure, the State and the defendant shall have the right to examine prospective jurors under oath, the scope of the examination to be within the Court's discretion. Under the directive contained in Article 788, "After the examination provided by Article 786 a prospective juror shall be tendered first to the State, which shall accept or challenge him. If the State accepts the prospective juror, he shall be tendered to the defendant, who shall accept or challenge him."

▬ The procedure thus prescribed was followed in this case, but defense counsel asserts that the practice allows the State to make a very brief and cursory examination and place on the defense the onus of the detailed questioning and consequent possibility of antagonizing the prospective juror. Without developing the many possibilities of advantage or disadvantage to both the State and defense which may con-

ceivably result from this procedure, it occurs to us that the ultimate best advantage may well lie with the defense; for when the prospective juror is tendered after questioning by both the State and the defense, the State must first accept or challenge, and any peremptory challenge exercised by the State may save such a challenge for the defense. We find no undue disadvantage resulting to the defense which does not result, say, from the order of presenting closing arguments or other like procedure. Suffice it to say that the procedure is prescribed by the Legislature, and in the absence of a constitutional infirmity, properly urged, it will be applied by this Court. State v. Henry, 197 La. 999, 3 So.2d 104 (1941).

### Bills 45 through 50

During voir dire examination, defense counsel asked a prospective juror, "Do you believe it's possible that here today the state has indicted the wrong man for this murder?" Other questions to this same prospective juror were, "* * * would you give greater weight to an inculpatory statement given by the hands (sic) of a person in the hands of the police? Would you give greater weight to it?" And further, in regard to an inculpatory statement, "Would the weight you gave such question be lessened if you know the person giving the statement in custody had an IQ of 61 and a mentality of a ten year-old child?"

Again, "Do you believe a person with the mentality of a 10 year old child is more easily led than a mature person?", and "* * * would you give more weight to an inculpatory statement while in the hands of the police?" Finally, to another juror— "Would the weight you gave such a statement be lessened if you know that the person had a low IQ and a mentality of a ten year-old?"

All of the questions were objected to, and the objections properly sustained. By these questions defense counsel sought to elicit from the jurors in advance their opinion concerning the weight of the evidence and the guilt or innocence of the accused. Voir dire examination is designed to test the competence and impartiality of prospective jurors and may not serve to pry into their opinions concerning evidence to be offered at the trial. In State v. Smith, 216 La. 1041, 45 So.2d 617 (1950), we said, "* * * hypothetical questions and questions of law are not permitted in the examination of jurors which call for a prejudgment of any supposed case on the facts."

These bills are without merit.

### Bill 51

This bill is based upon a series of questions and answers which are alleged to furnish a basis for challenge for cause of Charles L. Risher, a prospective juror.

While being examined on voir dire, he was challenged for cause by the defense, because he stated that he would be swayed by the opinion of other jurors in his deliberation. When he answered in this manner, and before ruling on the challenge, the trial judge asked, "Mr. Risher, of course you can listen and discuss this case as a member of the jury in the jury room in your deliberation, now if you were convinced after hearing the evidence of a certain fact would you rely on what your conclusion had been unless you were— there were facts that brought up or mentioned—would you rely strictly on the evidence that is produced in this Courtroom and after you came to a conclusion remain with that conclusion?", to which Risher answered, "Yes, sir." The judge then denied the challenge for cause. The ruling was correct.

·· [37] After questioning Risher concerning inculpatory statements, during which it was necessary to define "inculpatory" for Risher, defense counsel asked if he would give an inculpatory statement admitted into evidence the same or more weight than other evidence. Risher answered he would give it more weight. He was challenged for cause by the defense, and the judge asked him, "If you were instructed by the Court, Mr. Risher, that the law required you to give it the same weight as any other evidence would you abide by that instruction from the Court?", to which

Risher replied, "Yes, sir." This ruling was correct.

When Risher was asked, "Would you give any weight as evidence to what the State says in its opening statement? Would this influence you?", he answered, "I would have to hear it." Defense counsel then asked, "Could it influence you as evidence?" Risher answered, "Yes, sir." He was again challenged for cause by the defense. The judge then asked, "Mr. Risher, if the Court instructed you that under the law the opening statement was not to be considered as evidence in itself could you abide by that instruction?", to which Risher responded, "Yes, sir." The challenge for cause was then denied. This ruling was correct.

Counsel for defense then challenged Risher for cause urging that the cumulative effect of the foregoing questions and answers demonstrated Risher could not make an independent decision in the jury room. This challenge was likewise properly denied.

In addition to his other interrogation of the juror, the trial judge posed this question: "Let me ask one question in line with that, Mr. Risher, if you are chosen as a juror in this case you will hear the evidence from witnesses from this witness stand and evidence given in this Court room and you will be instructed as to the law by the Court, now if you are chosen as a·

juror in this case can you decide the case based solely on the evidence and instructions of law as given you by the Court?" Risher answered, "Yes, sir."

We attribute Risher's apparent confusion to the fact that he had never served upon a jury before and to his lack of familiarity with the terms employed in his interrogation. He disclosed, however, all the necessary qualifications for a sound and competent juror when his duties and responsibilities were made known by the judge.

This bill is without merit.

### Bill 52

■■■ On voir dire examination, when the prospective juror Gene M. Newsome was asked whether he would give an inculpatory statement more or less weight than other evidence, he responded he would give the inculpatory statement less weight. He was then asked, "Why—what is your reasoning behind that?", and the district attorney objected. The objection was sustained. When a bill was reserved the judge immediately asked Newsome, "If you are instructed by the Court as to how much weight should be given an inculpatory statement would you abide by that instruction?", to which Newsome replied, "Yes, sir."

Without the juror having been instructed as to the law relative to inculpatory statements, the Court did not feel that the juror could properly answer this question. The

legal and constitutional guidelines for determining the weight to be given an inculpatory statement were included in the Court's charge and there was, therefore, no error in the ruling or prejudice to the defendant.

This bill is without merit.

### Bill 53

Another challenge for cause was denied when defense counsel asked a prospective juror if a possibility existed that he would be prevented from impartially judging this case because the juror had a working wife and two daughters. The juror answered, "There would have to be a possibility. I do not know how you intend to question so I cannot give you a definite answer on that."

The trial judge was not satisfied that this answer meant the juror could not be impartial, and we agree. In the context of the other questions this juror answered, we are satisfied he was an intelligent juror, able to judge impartially in this case. This man's impartial attitude is best illustrated when he answered, "Knowing nothing of the facts of the case I can't really answer your question." We think it was his innate honesty which compelled him to answer that his family structure might possibly influence his judgment. It would be unrealistic to deny that a person's relations had no effect upon his judgment. All men's judgments are colored to some degree by their experi-

ences. Jurors are human, and we cannot expect antiseptic judgments from them.

This bill has no merit.

### Bill 54

■ Prospective juror Ernest B. Franton was challenged for cause by the defense because, after he received notice that he would be called as a juror, he saw the victim's automobile and the blue Ford; and his father, a deputy sheriff, made the statement in his presence that the body of the victim was found in the trunk of the victim's car. He was again challenged for cause because he had been a policeman, he had known and been friends with two jurors, twelve prosecution witnesses, several employees of the sheriff's department, and his father was an employee of the sheriff's department at the time of trial. It was proper to deny these challenges.

Franton's view of the automobile was incidental to a conversation with his father at the airport where the vehicles were stored. It was, at best, a very cursory observation and he had only a vague recollection of the incident. He had been a policeman for two years, about 12 or 15 years prior to the trial, and his acquaintance with the jurors and prosecution witnesses was, almost without exception, very casual.

Although his father was a deputy sheriff, Franton testified that he would require the State to prove beyond a reasonable doubt that defendant was guilty and that he would abide by the Court's instructions to decide the case solely on the evidence produced in the courtroom. None of his answers indicated the slightest disposition to be partial. Under these circumstances we can find no abuse in the judge's discretion in this ruling and no cause recognized by law to support the challenge. La.Code Cr.P. art. 797 (1967); State v. Schoonover, 252 La. 311, 211 So.2d 273 (1968), cert. denied 394 U.S. 931, 89 S.Ct. 1199, 22 L.Ed.2d 460 (1969).

### Bill 55

■ The defense challenged prospective juror W. B. Dorris when in his examination he indicated that because of his age, 67, he may not be able to remember all of the evidence presented in a lengthy trial. We are convinced, as the trial judge was, that the witness was under the apprehension that it was necessary for him to remember every detail of the evidence presented. When he was asked by the judge if he would be able to remember the substance of the evidence presented at the trial, he answered that he probably could.

Dorris was also challenged for cause because his answers to vague and confusing questions indicated that he would require the defendant to prove his innocence. After questioning by the Court, however, it became apparent that Dorris understood the law concerning the presumption of inno-

cence and the need for the State to prove defendant's guilt beyond a reasonable doubt. He said, also, that he would impute no adverse presumption to defendant's failure to take the stand in his own behalf. He was therefore qualified.

This bill also presents for consideration a ruling of the trial judge which prevented defense counsel from posing repetitious questions on the subject of a challenge which had already been denied. As this voluminous record and profusion of bills makes clear, the trial judge has granted the defense wide latitude in the presentation of its case and in preserving bills for appellate review. It was entirely within the judge's discretion to impose this reasonable limitation in the interest of orderly trial procedure.

Although counsel for the defense has argued in brief that Dorris was subject to challenge for cause as an impartial juror because Dorris had belonged to the Ku Klux Klan in the past, and because he was then a member of the White Citizen's Counsel, this was not made the subject of a bill. Consequently, the trial court did not rule upon the question, and it is not properly presented for review here.

In any event, in our review of the record we find that Dorris no longer subscribes to the principles of the Ku Klux Klan, whatever they may be, since those principles are not disclosed. And, insofar as the White Citizen's Council is concerned, as we understand his testimony, he has been furnished a gratuitous subscription to the paper the council publishes, which he reads, and that is the extent of his participation. The objects and purposes of this organization are likewise not contained in the record. Counsel for the defense has entered just enough evidence in the record to raise the specter of racism by imputation in the hope, no doubt, of enlisting the credulous in his cause and inflaming the bigot. We are, for these reasons, unable to conclude from this record that Dorris would not be an impartial juror. It would require a resort to conjecture and speculation to support the defense contention.

This bill is without merit.

*Bill 56*

Jake Humble, a prospective juror, after voir dire examination, was challenged for his past association with the Ku Klux Klan, because of his friendship with the victim's brother, and because he had a heart attack several months prior to the trial. The challenges were denied. None of these grounds furnish a proper basis for challenge for cause here.

Humble had disassociated himself from the Ku Klux Klan years before because he did not feel the program would benefit himself or the community. He forthrightly stated his prior association with that organization would not interfere with his

impartial judgment in the case. See Bill 55, ibid; State v. Dunn, 161 La. 532, 109 So. 56 (1926), writ of error dismissed 273 U.S. 656, 47 S.Ct. 344, 71 L.Ed. 825.

Humble answered that he had been friendly with the victim's brother, but the record indicates they have not seen each other recently. And although conceding that their friendship would suffer as the result of a not guilty verdict, Humble answered that this friendship would not prevent him from making a fair determination in the case.

Insofar as Humble's heart condition was concerned, his doctor advised that he could return to work and he was then working eight hours a day.

The bill has no merit. La.Code Cr.P. art 797.

### Bill 57

During voir dire examination of juror Cary K. Brooks, the defense renewed its objection to the failure of the State to accept or reject a prospective juror before tendering him to the defense. The judge overruled the objection, and the defense reserved this bill to the ruling, making the objection general.

In Bill 44 we considered this identical contention and found it to be without merit.

### Bill 58

▬ In this bill, defense counsel represents that prospective juror Brooks was challenged for cause on the grounds that " * * * his wife was a nurse, as was the victim, she traveled the same route to work as did the victim on the day of the murder, and that he had a preconceived opinion about the facts of the case that would not readily yield to the evidence."

It is true, as the bill represents, that Brooks' wife had formerly been a nurse's aide and traveled a route which took her past the point where the murderers stopped the victim's automobile. The inference to be drawn from these facts is mitigated to a considerable extent by the fact that Brooks' wife no longer worked as a nurse's aide, having given that work up to have a baby about ten months prior to the voir dire examination. It was definite that she would not return to work at the same hospital and, possibly, not return to work in any event.

With respect to Brooks' alleged preconceived opinion about the facts of the case, we do not agree that the record supports a finding that these so-called opinions would not readily yield to the evidence. To the contrary, questioning by the judge definitely established that Brooks' preconceived opinions, if they were such, would yield to the evidence. And we doubt, too, that Brooks expressed a "preconceived opinion" of the facts. What he did intimate, in sub-

stance, was that news of the crime caused concern to himself and his wife. He did not feel, however, that this concern would affect his fairness or impartiality while considering the facts in Court.

### Bill 59

 Defense counsel objected to the State's peremptory challenge of a prospective juror, Martin, on the grounds that Martin was one of two Negroes on the venire who had been peremptorily challenged by the State. As a result there were no Negroes on the jury which tried Square.

The right to peremptory challenges is guaranteed to an accused by the Constitution of this State. La.Const. art. 1 § 10. The number of peremptory challenges allowed the State and the defendant is fixed by Article 799 of the Code of Criminal Procedure. It is not a right to select, but to reject, to be exercised without assigning reasons or without being subjected to inquiry into the motives underlying the exercise of the right. Neither the State nor the defense may complain of peremptory challenges exercised by the other. State v. Ward, 246 La. 766, 167 So.2d 359 (1964); State v. Durr, 39 La.Ann. 751, 2 So. 546 (1887). See also State v. Barksdale, 247 La. 198, 170 So.2d 374 (1965) and State v. Sevin, 243 La. 1023, 150 So.2d 1 (1963).

The cases outside our jurisdiction, which have passed upon the question of the use of peremptory challenges to exclude persons from a jury belonging to a race or class, have likewise adhered literally to the traditional concept of the nature of a peremptory challenge as absolute, and as precluding inquiry into the motives or mental attitudes of the one to whom the right is given. See United States ex rel. Dukes v. Sain, 7 Cir., 297 F.2d 799 (1962), cert. denied, 369 U.S. 868, 82 S.Ct. 1035, 8 L.Ed.2d 86 and 4 A.L.R.2d 1200. Finally, the United States Supreme Court has set this question at rest in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) when Mr. Justice White declared for the Court:

* * * we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto,* would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would

be banned. (380 U.S. 221, 85 S.Ct. 836–837, 13 L.Ed.2d 759).

Defense counsel has furnished no authority to support this bill and, as the authority we rely upon requires, we find the bill to be without merit.

### Bill 60

 This was the final bill reserved on voir dire examination of prospective jurors.

While Fred William Huenefeld, Jr., was being examined, he answered affirmatively that he was opposed to returning a qualified verdict. Later, he was asked, " * * * can you imagine any circumstance under which you would render a qualified verdict in a capital case?" The district attorney objected, the Court sustained the objection, and this bill was reserved.

This is another instance in which isolated statements have been culled from the testimony of the prospective juror without reference to explanatory questions and answers which qualify them. Thus a partial picture is presented by the bill which seemingly has merit, but, when considered along with the full testimony of the prospective juror, it becomes apparent that the bill has no merit.

After a clear and explicit explanation by the Court, Huenefeld answered he would fairly weigh the question of a qualified verdict with an open mind.

In our consideration of this and other bills received on voir dire examination of prospective jurors, we have been mindful of the guidelines recognized in our law relating to the judge's rulings on the qualifications of jurors. The judge's exercise of sound discretion in ruling will be sustained unless unwisely exercised, providing that he allows considerable latitude in the examination of jurors. State v. Rogers, 241 La. 841, 132 So.2d 819 (1961), cert. denied, 370 U.S. 963, 82 S.Ct. 1589, 8 L.Ed.2d 830. We are satisfied these standards have been observed.

### Bill 61

 During the trial the defense moved for a recess in the trial until the district attorney's opening statement could be transcribed and furnished to him; for the proof offered by the State must fall within the purview of its opening statement, and the transcribed copy was necessary to determine those limits during the course of the trial.

The motion was denied, but the judge did order the transcribed statement furnished to defense counsel by noon the next day. We find no error in this procedure; and, since the defense raised no question concerning the admissibility of any evidence offered by the State prior to receipt of the transcribed statement before noon the next day, no prejudice has resulted.

*Bill 68*

A question of fact is presented by this bill. At issue is the correctness of the trial judge's ruling permitting the admission in evidence of certain checks and fragments of checks, designated as State exhibits 1, 2, 3 and 4, which were represented as belonging to the deceased victim. It is contended that the State failed to establish the chain of custody of this evidence with sufficient certainty, and the evidence should not have been admitted.

Chief Dortch, Officers Fincher and Antley repaired to the river bank where the victim's body was found on April 14. Officer Antley was accompanied by his brother-in-law Cleo Shrader. In searching the area for evidence, Shrader found a folded check in a rut near the water's edge. The check was drawn on Central Savings Bank, numbered 253, dated 4/13/68, payable to Cash and signed by the victim, being one of a series of personalized checks with the victim's address imprinted on its face. Nearby Antley and Shrader found a number of other papers belonging to the victim, which were wrapped in a blanket. They included these items: "registration of car, some insurance papers * * * Central Savings Bank checks * * * cancelled checks *. * *." Shortly thereafter Officer Fincher waded out into the water and found a checkbook floating with accumulated drift wood. When the checkbook was opened, the first numbered check was 254. On the reverse side of this check the name of John Thomas Roy was written.

Chief Dortch, Fincher, Antley and Shrader all witnessed the recovery of these items and were afforded an opportunity to inspect them.

In the meantime Chief Walker, Chief Criminal Investigator of the Sheriff's Office, arrived. All of the objects were delivered to the custody of Chief Walker, along with a piece of one-inch galvanized pipe found lying in the grass near a fence at the scene. Chief Walker put the checks in the trunk of his automobile, placing the wet checks on a sack to dry. The trunk lid was open, but under observation at all times until he prepared to leave, at which time the lid was closed. Later, the handwriting on the checks was identified as the victim's by her husband and son.

When he arrived at his office later that afternoon the wet check and other items were spread on paper or sacks on a table and on the floor to dry. A window air conditioner was turned on to circulate the air and hasten the drying process. The objects remained in that room for two or three days.

Chief Walker's office was kept locked except when he was working there. Only the sheriff and janitor had keys, the janitor having been instructed not to enter the office while the evidence was there. When the checks became dry they were marked

by Chief Walker for identification and he immediately placed the checks in a cellophane envelope, which in turn was inserted in a Manila envelope. They were retained in Chief Walker's office. Walker addressed the container and Walker personally took the container to American Express for shipment to the Federal Bureau of Identification under "Protective signature".

An expert from the office of the FBI testified that the checks were submitted to that office with the request that it be determined whether the writings on the separate checks were all subscribed by the same person. He was of the opinion they were, and he identified the checks as those received in the FBI office.

A sufficient chain of custody was established to permit the admission of those documents in evidence. There is no showing whatever that the documents were tampered with while in Chief Walker's office. Only by conjecture and speculation can we sustain the defense contention. We do not understand the law to require absolute proof in these instances. A clear preponderance is sufficient on a question of admissibility. Moreover, the objection is more properly addressed to the weight to be accorded the evidence. State v. Coleman, 254 La. 264, 223 So.2d 402 (1969).

### Bill 69

During the trial the State called Dan Slakter, owner-manager of Kirchoff's

Department Store in West Monroe, as a witness. He testified that he called Chief Mitchell of the West Monroe police to report that someone had tried to cash a check at his store on April 13, 1968. He associated the check with the victim's name, which he learned by reading newspaper accounts of the crime. He described the party who tried to cash the check to be colored, about 5 feet, 10 inches tall, weighing 165 pounds and between 19 and 25 years of age. This man had a companion at the time who generally fit the same description, perhaps a bit taller. He refused to cash the check.

On cross-examination the witness testified that he could not say either person was Square, the man on trial at the time. Further questioning on cross-examination elicited the fact that Slakter viewed a line-up but could not identify anyone.

The contention is made that Square was compelled to appear in a line-up without counsel, contrary to the pronouncements of United States v. Wade, 388 U.S. 218, 87 S.Ct.1926, 18 L.Ed.2d 1149 (1967); and the State withheld the information that Slakter was unable to identify Square at the line-up, information favorable to the defense, contrary to the rule announced in Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

Since the State offered no evidence related to the lineup, and the witness made no in-court identification of the defendant,

the rule of United States v. Wade is not violated. See also State v. Allen, 251 La. 237, 203 So.2d 705 (1967).

Insofar as the contention based on Giles v. Maryland is concerned, the information asserted to be withheld was elicited by defense counsel on cross-examination. The witness' testimony was favorable to the accused and the Giles v. Maryland rule, already discussed, has no application.

### Bill 71

■■■■■■ Special agent Robert E. Neill of the FBI was tendered by the State as an expert in the field of hair and fiber identification. The defense objected to Neill's qualifications on the grounds that this field is a new one, and the witness was not a medical doctor or zoologist. This bill was reserved when the objection was overruled.

Neill had been employed with the FBI since 1961. At the time of the trial he was assigned to the staff of the Laboratory Division in Washington. He specialized in microscopic examination of hairs, fibers and textile materials. He held an A.B. degree with a major in zoology from the University of Missouri, having completed work on the graduate level at the University of Missouri, Columbia University and Catholic University. He was then working on his Master's degree, leading to a degree in forensic science at George Washington University.

After being initially assigned to a laboratory division for two years, he had had experience under the guidance and supervision of recognized experts in the field. He was later qualified to conduct examinations on his own in the field of identification or comparison of hairs, fibers and textile material. He had been qualified as an expert in about thirty states in both Federal and State tribunals.

Louisiana has adopted a statute which covers this subject:

The test of competency of an expert is his knowledge of the subject about which he is called upon to express an opinion, and before any witness can give evidence as an expert his competency so to testify must have been established to the satisfaction of the Court. (La.R.S. 15:466).

Without a doubt, Neill was properly qualified as an expert. There was no showing to the contrary. Competency of an expert is a question of fact, which like other fact questions is to be determined by the trier of fact. A wide discretion is accorded in passing upon the qualifications of witnesses, which we will not disturb in the absence of manifest error. State v. Alexander, 252 La. 564, 211 So.2d 650 (1968).

### Bill 73

During the trial the State offered to introduce hair clipping purporting to have been taken from Square while he was re-

ceiving a haircut in the city jail. Objection was made that taking the hair clippings violated Square's constitutional rights. This question was considered in detail in connection with Bill 43, and we refer to the reasons there for our rejection of this contention.

Objection was also entered at the time that the chain of custody of the hair clippings was not sufficient. The chain of custody of the hair clippings is conceded in brief to be the same as that followed in the case of the checks referred to in Bill 68 with some variations. Principally, it is contended that clippings were taken from Millsap's hair and Square's hair at the same time and kept in the same room and the suggestion is made that the samples "possibly" became confused. Such a contention has no merit, and this bill is unfounded.

### Bill 75

▇▇ Officer Charles Dortch testified that a pair of trousers bearing his identification mark were found by him near the river where the body of the victim was found. These had the name "Pecola Square" written as a laundry mark inside the pocket. Officer Dortch testified he knew Pecola Square to be the defendant's mother. When the State offered to introduce the trousers in evidence, defense counsel objected that the offering was not material and there was no connection between the name appearing in the trousers and the defendant. The objection was overruled and this bill reserved.

Clearly sufficient facts were shown, though circumstantial, to establish the relevancy of this evidence. A logical and rational connection existed between the fact sought to be proved (that Square was present at the location where the victim's body was found) and the fact at issue in the case (whether Square participated in the murder of the victim). Thus the test of relevance is satisfied. State v. Giles, 253 La. 533, 218 So.2d 585 (1969).

### Bill 76

▇▇ During the trial of the case, defense counsel objected to continuing night sessions of court because his fatigue deprived defendant of effective counsel. The objection was overruled.

Trial of this case consumed nine days, during which the jury was sequestered. In order to shorten the period of discomfort and inconvenience endured by the jury and in an effort to maintain the court's schedule of other business, night sessions were ordered. Each day the trial began at ten o'clock in the morning, noon recess was from twelve to one-thirty and, when night sessions were held, recess for dinner lasted an hour and a half or two hours. Night sessions ended at ten o'clock in the evening and no court was held on Saturday night or Sunday morning. Two very able lawyers

were appointed to represent ⋅ Square, and they were able to perform all the duties demanded by the trial.

The trial judge observed in his per curiam that counsel for the defendant exhibited no signs of undue fatigue during the trial. From the record we are satisfied that defence counsel vigorously pursued all situations which they considered may produce an advantage⋅for the defendant. Their perseverance in this respect was commendable. No prejudice resulted to the defendant from these night sessions.

### Bill 77

■■■ The State's theory of the case was that Millsap and Square occupied a blue Ford on the⋅early morning of April 13, and the Falcon automobile occupied by the victim on her way to work that morning was forced to stop when the blue Ford jammed it into the curb. In an effort to establish this fact, photographs of the two automobiles showing the scrapings and indentation which resulted from the collision were introduced in evidence. When the State offered in evidence the Ford bumper and Falcon fender, which had been removed from the respective vehicles, defense counsel objected that these objects were not the best evidence, the best evidence being the complete automobiles.

⋅ As pointed out, the connection between the bumper and fender with the Ford and Falcon was established by the photographs, and also by the testimony of Chief Walker who removed the parts and brought them to⋅court. It was, of course, impracticable to bring the complete vehicle into court.⋅ The bumper and fender were, therefore, the best evidence and, insofar as we can ascertain, defense counsel made no motion to have the jury view the automobiles. Counsel's objection should be directed to an argument on the weight to be given the evidence, not on its admissibility. La.R.S. 15:436; cf. State v. Bates, 140 La. 833, 74 So. 165 (1917); State v. Hawthorn, 134 La. 979, 64 So. 873 (1914).

### Bill 82

During the trial defense counsel moved that all inculpatory statements of the defendant be excluded because Deputy Causey who gave the Miranda warnings testified that he did not explain to the defendant that he had the right to stop at any time. The motion was denied.

In a per curiam the judge found that the testimonies of Deputy Causey of the Ouachita Parish Sheriff's Department and Officer Fred Michael Davis of the West Monroe Police Department reflect that Deputy Causey did inform the defendant that he could stop at any time.

We quote Deputy Causey's testimony in support of this finding:

A. Before the machine is turned on we go through these rights and ask them if they understand that.

Q. And in addition to these things was he also told that he could stop or cease giving any of these statements once begun if he wanted to?

A. Yes, sir, Yes sir, and then on this at three something on the afternoon of the 16th he told us that he was going to tell us the complete truth and we went into this rights again, which that is the Supreme Court ruling and we have to advise them of their constitutional rights each time and we went into this again and we turned the machine on and read the waiver to him and explained these rights to him and I have that waiver here in my file also.

### Bill 86

In this bill the defense presents two issues: The first has to do with the denial of a motion for a directed verdict of acquittal on the grounds that the evidence did not establish the guilt of the defendant with sufficient clarity and no evidence was adduced of specific intent. The second issue involves denial of a motion for mistrial because the testimony of Millsap was outside the scope of the opening statement.

As to the motion for a directed verdict, this contention is disposed of by referring to and quoting with approval the most recent pronouncement of this Court on the subject:

Albeit appellant in this case filed a motion for a directed verdict which

would, in many jurisdictions, entitle him to a full transcript for consideration of the evidence on appeal, this cannot apply to appeals in felony cases in Louisiana where the jury is the sole judge of the facts pertaining to guilt or innocence. It is because of a clear constitutional ordinance thus providing (La.Const. art. 19, § 9) that this Court felt obligated to hold in State v. Hudson, 253 La. 992, 221 So., 2d 484, that Article 778 C.Cr.P., prescribing that the trial judge may direct a verdict of not guilty in a jury trial, is violative of our fundamental law. (State v. Douglas, 256 La. 186, 235 So.2d 563 (1970)).

As to the contention that there was no evidence of specific intent, we refer to the pertinent part of Article 10 of the Criminal Code which defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Obviously if the circumstances established that Square stabbed the victim a number of times, which we find the evidence supports, Square must have actively desired her death.

Moreover the evidence supports a finding that Square killed the victim while engaged in the perpetration of rape, and in this latter instance specific intent is not an element of the crime. La.R.S. 14:30.

The contention that the testimony of Millsap was outside the scope of the opening statement is also without merit. He testified that he was present with Square during most of the time on the evening of the crime and the next day when the attempt was made to cash the check. The substance of Millsap's testimony was outlined in general terms in the opening statement although Millsap was not referred to by name, which is the main complaint.

Article 766 of the Code of Criminal Procedure sets forth that, "The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge."

In State v. Paternostro, 225 La. 369, 73 So.2d 177 (1954) we said:

> The district attorney is not required to give in minute detail all of the evidence he intends to produce or the name of each witness he intends to place on the stand. * * * It is sufficient for the district attorney to explain in his opening statement the nature of the charge and the purport of the evidence by which he expects to establish same.

It is not required that the district attorney give all of the evidence in minute detail or the names of each witness he intends to place on the stand. State v. Winey, 216 La. 560, 44 So.2d 115 (1950).

Defense counsel requested that the following special charge be given to the jury: "One joining in a common design to commit an unlawful act, the natural and probable consequence of which involves the contingency of taking life, may escape responsibility by withdrawing and notifying his confederates thereof before the homicide is committed." The charge was denied by the trial judge for it was not pertinent.

A requested charge "shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." La.Code Cr.P. art. 807.

Square's defense was an alibi, and the requested charge based upon an assumption that he was a party to a common design is wholly without relevance to the defense. It is contended, however, that statements made by Square to the sheriff's deputies were to the effect that he did not condone the murder. These statements contained no assertions by Square that he had withdrawn and notified his confederates to that effect. To the contrary, the statements disclosed that Square assisted in placing the victim's body in the trunk of her automobile.

The requested charge was properly refused.

## Bill 97

 This bill is based upon the postulate that the trial judge refused to charge that the confessions could not be considered if the accused had been subjected to any treatment designed by effect on body or mind to compel the confession. Such a ruling is said to be a denial of the constitutional right embodied in Article I, Section 11, of our Constitution: "No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made."

The general charge set forth that the accused could not be questioned concerning the crime unless given the warning prescribed by the Miranda decision and "he may not be questioned unless he voluntarily, knowingly and intelligently waive these constitutional rights." The admissibility of a confession under our law is a question for the judge and the weight to be given to a confession once admitted is a matter for the jury. Without explanation the requested special charge would tend to mislead the jury. It has been held that it is grounds for mistrial if the admissibility of a confession is tried in the presence of a jury and the judge decides that the confession is inadmissible. See La.Code Cr.P. art. 794; State v. Lanthier, 201 La. 844, 10 So.2d 638 (1942).

We are of the opinion that this charge, taken in connection with the charges involving the Miranda warnings, was sufficient.

## Bill 98

 A special charge was requested which would instruct the jurors at the conclusion of the trial to step forward and make known to the court whether their response to any question on voir dire was erroneous, or if it had come to their knowledge that the answer of any other juror was false, or if they had formed any preconceived opinion in the case which would not readily yield to evidence. The requested charge was denied.

Article 789 of the Code of Criminal Procedure providing for the impanelling of alternate jurors is relied upon to support this contention; the argument being that if any juror should step forward and disclose that he was disqualified, the alternate juror could replace him.

We are of the opinion that under Article 789 the jurors once selected are expected to serve, save in cases of death, illness or other cause which renders the juror unfit or disqualified to perform his duty. Discovery of the fact that a juror had furnished erroneous information, lied or had a fixed opinion which would not yield to the evidence after the juror was accepted for service would perhaps be a basis for a prosecution for

perjury or grounds for a new trial, but we know of no authority to compel the judge to give the special charges complained of here and we have been cited to none. Special charges are not designed to permit counsel to rehash the voir dire examination; nor can special charges be utilized to encourage jurors to avail themselves of a last minute "out" in a difficult case.

The case of State v. White, 244 La. 585, 153 So.2d 401 (1963) cited by the defense stands for the proposition that a judge is without authority to excuse a juror and substitute an alternate unless and until a juror dies, is too ill to serve, "or there is a legal cause that renders him incompetent to serve." The legal cause rendering the juror incompetent to serve does not contemplate those set forth in the requested special charge.

This bill is not meritorious.

### Bill 100

A special charge was requested relating to the consideration the jurors should give to expert testimony, admonishing them that the question of guilt or innocence was for the jury and findings of expert witnesses were not to be taken as proof of guilt. The charge was denied.

In his general charge the judge announced, "The experts are merely witnesses, and you have the right to either accept or reject their testimony and opinions in the same manner and for the same reasons for which you may accept or reject the testimony of other witnesses in the case."

This general charge covers the requested special charge, and this bill is without merit.

### Bill 103

A motion was filed on February 10, 1969, after trial and verdict, praying that a full transcript of the proceedings be furnished and that sentencing be stayed pending completion of the transcript. Full transcript was ordered, but the court refused to stay sentencing pending its completion. The motion was denied.

It is contended that the transcript was essential to enable the defense to prepare a post-trial motion in arrest of judgment and a motion for a new trial. Without the transcript it is urged these had to be prepared from memory, depriving defendant of a proper defense.

Article 874 of the Code of Criminal procedure requires that sentence shall be imposed without unreasonable delay. A complete transcription of all hearings and the trial proceedings was prepared and has been filed in this case, consisting of 1,840 pages, plus exhibits. Several months were required to accomplish the transcrip-

tion. Undoubtedly an unreasonable delay would have occurred if the disposition of post-trial motions and sentencing had to await the completion of this record.

A motion in arrest of judgment in this case must have been grounded upon one of the following contentions: a defective indictment; that the crime charged was not covered ·by statute; the court was without jurisdiction; that the selection of jurors and the number required by the constitution were not complied with; the verdict was not responsive to the indictment or otherwise defective; double jeopardy occurred; the prosecution was not timely urged or that the prosecution was not instituted by a grand jury indictment, all as provided for in Article 859 of the Code of Criminal Procedure. Since the information which would furnish these grounds was available without a transcription of the trial proceedings, no basis for granting the motion is stated in this regard.

The motion for a new trial and a supplemental and amending motion were based upon the bills of exceptions reserved during the trial. Those relied upon on appeal have been considered in this opinion and found to be without merit, having been considered by us with the benefit of the entire transcript. It is to be noted that all of the bills taken and referred to in the motion for a new trial and its amendment and the issues presented thereby were concisely set forth in these motions. We fail to see, therefore, how defendant was prejudiced by not having the transcript prior to sentencing.

This bill is without merit.

### Bill 104

This motion is based upon the denial of the motion for a new trial. The motion was based upon the bills of exceptions reserved at the trial and which have been considered in detail on this appeal. Having found the bills relied upon to be without merit, the denial of the motion for a new trial was properly denied. This bill is therefore without merit.

The conviction and sentence are affirmed.

McCALEB, C. J., concurs in the result as to bills 19, 20 and 21 and subscribes to the opinion in all other respects.

BARHAM, J., concurs in the result.

TATE, Justice (concurs in the result).

I concur in the result. I have especial reservations as to dicta in connection with the disposition of Bills 19–21 and 86, reiterating approval of recent expressions of this court in State v. Terrebonne, 256 La. 385, 236 So.2d 773 (1970) and State v. Hudson, 253 La. 992, 221 So.2d 484. These decisions were rendered by a closely di-

vided court and included holdings and dicta which should be re-examined. Although not agreeing with the rational of the majority opinion in all respects, the writer agrees that the conviction should be affirmed, since errors complained of, to the extent the complaint is valid, did not result in a miscarriage of justice, were not prejudicial to the substantial rights of the accused, and did not constitute a substantial violation of a constitutional or statutory right of the accused, under all the circumstances shown by the entire record. La.C.Crim.P. Art. 921.

PER CURIAM.

In his motion for rehearing, defendant reasserts Bill of Exceptions No. 105, not specifically disposed of in our original opinion.

We have examined the bill and find it to be without merit. Despite the order of severance, the grand jury indictment is valid. Hence, since trial was had on a valid indictment, the motion in arrest of judgment was properly overruled.

The motion for rehearing is denied.